**Stefan GOMES and Paris Minor, Plaintiffs,**

v.

**UNIVERSITY OF MAINE SYSTEM, Trustees of the University of Maine System in their official Capacities on behalf of the University of Maine System, Peter S. Hoff, individually, Robert Kennedy, in his official Capacity as Interim President of the University of Maine, Elizabeth J. Allan, individually and as Chair of the Student Conduct Code Committee of the University of Maine, David Fiacco, individually and as Judicial Officer of the Student Conduct Code Committee, Robert Dana, individually and as Dean of Student Affairs at the University of Maine, and Robert E. Whelan, individually and as Chair of the Student Conduct Code Appeals Committee of the University of Maine, Defendants.**

No. CIV.03–123–B–W.

United States District Court, D. Maine.

April 8, 2005.

See also 304 F.Supp.2d 117.

**10**

Frederick F. Costlow, Richardson, Whitman, Large & Badger, Bangor, ME, Harrison L. Richardson, Richardson, Whitman, Large & Badger, Portland, ME, Mary F. Kellogg, Richardson, Whitman, Large & Badger, Bangor, for Paris Minor and Stefan Gomes, Plaintiffs.

Paul W. Chaiken, Rudman & Winchell, Timothy A. Pease, Rudman & Winchell, Bangor, ME, for University of Maine System, Trustees of the University of Maine System, Peter S. Hoff, Elizabeth J. Allan, David Fiacco, Robert Dana and Robert E. Whelan, Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WOODCOCK, District Judge.

On September 25, 2002, following a disciplinary hearing, the Student Conduct Code Committee (Hearing Committee) of the University of Maine found that the Plaintiffs, Stefan Gomes and Paris Minor, undergraduates at the University, had sexually assaulted a female student and, thereby, violated the Student Conduct Code. The University suspended them for one year. After the Plaintiffs' administrative appeals failed, they turned to this Court for relief, asserting the disciplinary process was substantially flawed. Although the University's disciplinary process was not ideal and could have been better, this Court concludes it was fundamentally fair and accorded the Plaintiffs the essential elements of due process. This Court GRANTS the Defendants' Motion for Summary Judgment.

## I. THE LAW SUIT

The Plaintiffs filed a cause of action against the University of Maine System, the Trustees of the University of Maine System, and six individuals, Peter S. Hoff, Robert Kennedy,[1] Elizabeth J. Allan,

---

1. On August 27, 2004, the Plaintiffs filed a Request for Order of Substitution of Parties (Docket No. 91) pursuant to Fed.R.Civ.P. 25(d). Peter S. Hoff, who was President of the University at the initiation of the law suit, was no longer the President, and Robert Kennedy had assumed the position of Interim President. This Court GRANTS the Request for Order of Substitution of Parties. Mr. Hoff remains a party only in his individual capacity; Mr. Kennedy becomes a party only in his official capacity.

David Fiacco, Robert Dana, and Robert Whelan, individually and in their respective official capacities at the University. The University subjected the Plaintiffs to discipline for allegedly committing a sexual assault on June 10, 2002. The Complaint (Docket # 1) contained ten counts, alleging the Defendants committed a number of constitutional, contractual, and tort violations in disciplining the Plaintiffs. On February 23, 2004, this Court granted the Defendants' Motion to Dismiss Counts I, IV and V. *Gomes v. Univ. of Maine Sys.,* 304 F.Supp.2d 117 (D.Me.2004). This Court also granted the Defendants' Motion to Dismiss Count II to the extent it claimed violations of substantive or procedural due process relating to territorial limitations of University jurisdiction. *Id.* On all other counts, this Court denied the Defendants' Motion to Dismiss. *Id.* The Defendants have now moved for summary judgment on the remaining counts.[2]

## II. STATEMENT OF FACTS

### A. The Allegation

Following an incident on June 10, 2002, a female University student (Complainant) accused two male University students of sexually assaulting her. Consolidated Statement of Material Facts (SMF)[3] (Docket # 95) ¶¶ 1, 2 The two male students, former members of the University football team, are the Plaintiffs in this case.[4] Am. Compl. (Docket # 42) ¶¶ 1, 2.

### B. The Student Conduct Code: An Overview

The University has adopted a Student Conduct Code (Code), which sets forth the procedures it follows upon notice of a potential violation.[5] Under the Code, the University designates a campus official, denominated the "Officer," to investigate alleged violations of the Code, to notify the respondent of his conclusions, and, if appropriate, to impose sanctions. Code §§ V.A., B. If the Officer concludes there is doubt whether a violation occurred or what sanction should be imposed, he may refer the matter directly to the Hearing Committee. *Id.* § V.B.4.c., d.

The Hearing Committee consists of three to seven members, at least one must be a student and one a Presidential designee. *Id.* § V.D.2.a. The President appoints the Chair. *Id.* The Hearing Committee is charged with holding a hearing to receive evidence, determining whether the respondent violated the Code, and, if so, imposing a sanction. *Id.* § V.D.4. If the Hearing Committee suspends or dismisses the respondent, the Code provides for two appeals. *Id.* § V.E. The first appeal is to a new person or group (the Appeal Committee); the second appeal is to the President or designee. *Id.* § V.E.2.

---

2. On July 20, 2004, the Defendants also filed a Motion to Exclude the Testimony of Peter DeTroy, III, Esq. (Docket # 64). In light of this Court's decision to grant the Defendants' Motion for Summary Judgment, this Motion is moot. The Motion to Exclude the Testimony of Peter DeTroy, III, Esq. is DISMISSED.

3. The parties filed separate statements of material fact; however, on September 14, 2004, the Defendants filed a Consolidated Statement of Material Facts (Docket # 95) to which this Court will make reference.

4. The Plaintiffs are African–Americans. Am. Compl. (Docket # 42) ¶¶ 1, 2. There is no allegation as to the race of the female student, and the Plaintiffs have made no claim that race played a role in the Defendants' actions.

5. This summary of the provisions of the Code is derived from a deposition exhibit, which is before this Court. The parties did not formally place the Code before this Court in their statements of material fact, but there appears to be no controversy as to the accuracy of the provisions of the Code, and this summary is for background purposes only.

The appeals are limited to a review of the procedures followed and the appropriateness of the sanction. *Id.* § V.E.1.a., b.

### C. The Gomes—Minor Investigation and University Procedure: An Overview

David Fiacco, as Director of Judicial Affairs, was the designated Officer within the meaning of the Code. The Complainant's allegations against the Plaintiffs constituted potential violations of Section III of the Code and, by reference, the University of Maine Rape and Sexual Assault Policy and Guidelines. *Id.* § III.; SMF ¶ 3. On July 16, 2002, pursuant to his request, Mr. Fiacco received information from the Old Town Police Department confirming a complaint of sexual assault had been lodged against the Plaintiffs. SMF ¶¶ 2, 133. On August 17, 2002, the Complainant signed a University incident report, stating a potential violation of the Code.[6] *Id.* ¶¶ 2, 3. This triggered an investigation by Mr. Fiacco, who referred the case to the Hearing Committee for an administrative hearing. *Id.* ¶¶ 4, 5.

The Hearing Committee, chaired by Dr. Elizabeth Allan, consisted of five members. *Id.* ¶ 6. The Hearing Committee held a hearing on September 24, 2002, and by letter dated September 25, 2002,[7] the Chair informed the Plaintiffs that it had concluded they had violated the Code by committing a sexual assault. *Id.;* Minor

Dep. Ex. 8; Gomes Dep. Ex. 5. The Hearing Committee suspended the Plaintiffs from the University through May 31, 2003 and made the suspensions effective immediately. SMF ¶ 7; Minor Dep. Ex. 8; Gomes Dep. Ex. 5. The Hearing Committee ruled the suspensions would not be stayed pending any appeal "for the protection of other persons." SMF ¶ 6; Minor Dep. Ex. 8; Gomes Dep. Ex. 5. It required the Plaintiffs to petition the University before returning as students and to comply with certain pre-conditions before doing so. SMF ¶ 7; Minor Dep. Ex. 8; Gomes Dep. Ex. 5. The earliest date they could file a reinstatement petition was August 31, 2003, and, if allowed to return to the University, they were to be placed on disciplinary probation for one calendar year from the date of their return. Minor Dep. Ex. 8; Gomes Dep. Ex. 5. Neither Plaintiff has petitioned to re-enroll at the University. SMF ¶ 14.

The Plaintiffs appealed the Hearing Committee's decision to the Appeal Committee. *Id.* ¶¶ 8, 9. The Appeal Committee consisted of three members: Robert Whelan, the Chair; Ann Pooler; and Mike Scott. *Id.* ¶ 9. On October 16, 2002, the Appeal Committee concluded the Hearing Committee did not commit procedural error and found the sanctions appropriate.[8] *Id.* ¶ 10. The Plaintiffs exercised their right to a second appeal before the President's designee. *Id.* ¶ 11. President Hoff named Mark Anderson, the University's

---

6. Sexual assault is a violation of the Code. SMF ¶ 3.

7. The Consolidated Statement of Material Facts makes reference to a letter dated September 25, 2002 from the Chair, Dr. Allan, which is attached as an exhibit. The parties have not formally placed this letter before this Court for purposes of the pending motion; nevertheless, there appears to be no disagreement as to the authenticity and accuracy of the letter, and this Court refers to its contents

to describe the nature and significance of the Hearing Committee sanction.

8. The Appeal Committee rejected a contention from the Plaintiffs that Dr. Allan had violated an obligation to provide disclosure of her affiliations, due to what the Plaintiffs contended was potential bias. However, one member concluded that the Hearing Committee should not have allowed the Complainant to introduce materials during the hearing. SMF ¶ 254; Scott Dep. at 87–88.

Interim Chief Financial Officer, as his designee for this appeal. *Id.;* Hoff Dep. at 53–54. Mr. Anderson reviewed the decision of the Appeal Committee and the Hearing Committee to determine whether procedures were followed and the sanctions were appropriate. SMF ¶¶ 11, 12; Costlow Dep. Ex. 60. On November 18, 2002, he concluded that the procedures "were in substantial conformity to the requirements of the code and afforded the Respondents fundamental fairness." Costlow Dep. Ex. 60. He also determined that "the sanctions imposed on the Respondents were appropriate given the findings of the committee." *Id.*

## III. LEGAL STANDARD

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir. 2001). "By like token, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* at 94 (citing *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); *see also* Fed. R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

## IV. DISCUSSION

### A. What is and is not Before the Court

This case comes before this Court in limited posture. The Plaintiffs' claims against the Defendants are grounded primarily upon the way the University officials conducted the process leading to its conclusion that the Plaintiffs had violated the Code and to its imposition of sanctions. In essence, the Plaintiffs claim that the Defendants failed to accord them a fair and impartial hearing and fair and impartial appeals before imposing and affirming significant sanctions. The Defendants respond that the University disciplinary proceedings were fundamentally fair. This Court's review is substantially circumscribed; the law does not allow this Court to retry the University's disciplinary proceeding.

This is not a lawsuit between the Complainant and the Plaintiffs. This Court is not asked to make an independent determination about what happened between the Plaintiffs and the Complainant on June 10, 2002. Neither the Plaintiffs nor the

**14**

Complainant have testified before this Court. This Court draws no opinion, therefore, about whether a sexual assault occurred, whether the acts were consensual, who among the Plaintiffs and the Complainant is credible, and who is not. This decision, which grants summary judgment in favor of the Defendants, is not a judicial finding either in favor or against the Plaintiffs or in favor or against the Complainant on the merits of her claims and their defenses.

### B. What Remains After the February 23, 2004 Order on the Motion to Dismiss

#### 1. Count I: Due Process (Against All Defendants)

Count I, as originally pleaded, attempted to state a direct cause of action for a general denial of rights protected under the United States and Maine Constitutions. Realizing this count did not state a cause of action, the Plaintiffs clarified they were retaining Count I only insofar as its allegations form a factual predicate for the remaining causes of action. Thus limited, the viability of Count I's allegations depends upon the extent to which they form the factual predicate for other viable causes of action. Count I, therefore, stands or falls depending upon what happens in other counts.

#### 2. Count II: 42 U.S.C. § 1983 (Against Defendants Allan, Fiacco, Hoff, Dana and Whelan)

Count II alleges a violation of procedural due process.[9] This Court's February 23, 2004 order dismissed Count II to the extent it was based on an assertion that the University's jurisdiction was territorially limited.

#### 3. Count III: Breach of Contract (Against Defendants University and Trustees)

Count III alleges that the University violated the terms of its contract with the Plaintiffs by conducting a disciplinary proceeding that violated their federal and state constitutional rights and contravened the Code.

#### 4. Count IV: Breach of Duty of Good Faith and Fair Dealing (Against All Defendants)

The February 23, 2004 order dismissed Count IV.

#### 5. Count V: Negligent Hiring and Supervision (Against Defendants University, Trustees, Hoff and Dana)

The February 23, 2004 Order dismissed Count V.

#### 6. Count VI: Negligence (Against All Defendants)

Count VI alleges that the Defendants had a duty to act with reasonable care in conducting disciplinary hearings against the Plaintiffs, failed to do so, and caused the Plaintiffs harm.

#### 7. Count VII: Defamation (Against All Defendants)

Count VII alleges that the Defendants falsely stated that the Plaintiffs committed a sexual offense and the Defendants defamed Plaintiffs in the manner they conducted the hearing and suspended the Plaintiffs. Count VII further alleges the

---

9. As originally cast, Count II also asserted a violation of substantive due process; however, this Court dismissed that claim. *Gomes v.* *Univ. of Maine Sys.*, 304 F.Supp.2d 117, 123–26 (D.Me.2004).

Defendants made public statements regarding the suspensions that defamed the Plaintiffs.

### 8. Count VIII: Negligent and/or Intentional Infliction of Emotional Distress (Against All Defendants)

Count VIII alleges the Defendants, by acting negligently or intentionally, have caused the Plaintiffs severe emotional distress.

### 9. Count IX: Negligent Misrepresentation (Against Defendants University Trustees, Fiacco and Dana)

Count IX alleges certain Defendants supplied false information to the Plaintiffs for guidance in their transactions as students and student athletes.

### 10. Count X: Punitive Damages (Against All Defendants)

Count X demands punitive damages against all the Defendants on the ground their conduct was so outrageous malice can be implied against the Plaintiffs.

### C. Count II: 42 U.S.C. § 1983: Procedural Due Process

### 1. The Plaintiffs' Claims: An Overview

The Plaintiffs contend that Defendants Allan, Fiacco, Hoff, Kennedy, Dana, and Whelan deprived them of their procedural due process rights:

> [B]y conducting a fundamentally unfair hearing which included depriving the Plaintiffs of critical and potentially exculpatory evidence gathered during the investigation, depriving the Plaintiffs of effective assistance of counsel, preventing the Plaintiffs from effectively cross-examining and confronting adverse witnesses, depriving the Plaintiffs of any effective administrative appeal, depriv-

ing the Plaintiffs of an impartial tribunal, and imposing severe punishment without substantial evidence.

Am. Compl. ¶ 30. They also allege the investigation, hearing, and appeal were "conducted in bad faith and sanctions were imposed in bad faith." *Id.* ¶ 31.

### 2. Applicable Law

■ The First Circuit has held that a student's interest "in pursuing an education is included within the fourteenth amendment's protection of liberty and property." *Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988). A student "facing expulsion or suspension from a public educational institution is entitled to the protections of due process." *Id.* Here, the Plaintiffs were students at a public university and potentially subject to expulsion or suspension. They are, therefore, entitled to the protections of due process. *See generally* Curtis J. Berger & Vivian Berger, *Academic Discipline: A Guide to Fair Process for the University Student,* 99 Colum. L.Rev. 289 (1999).

■ Determining an interest is protected by the due process clause of the Constitution is "only the beginning of the inquiry"; the question remains "what process is due." *Gorman,* 837 F.2d at 12 (citation and internal punctuation omitted). Due process is "not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation." *Id.* At a minimum, students facing disciplinary action, such as a suspension, must be given "some kind of notice and afforded some kind of hearing." *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Judge Gignoux of this Court adopted Professor Wright's description of the minimum requirements of due process in an academic setting:

(1) [T]he student must be advised of the charges against him; (2) he must be informed of the nature of the evidence against him; (3) he must be given an opportunity to be heard in his own defense; and (4) he must not be punished except on the basis of substantial evidence.

*Keene v. Rodgers,* 316 F.Supp. 217, 221 (D.Me.1970)(quoting Charles Alan Wright, *The Constitution on the Campus,* 22 Vand. L.Rev. 1027, 1071–72 (1969)). To these factors, *Keene* added: 1) the student must be permitted the assistance of a lawyer, at least in major disciplinary proceedings; 2) he must be permitted to confront and to cross-examine the witnesses against him; and, 3) he must be afforded the right to an impartial tribunal, which must make written findings. *Id.* (citations omitted); *see also Carey ex rel. Carey v. Maine Sch. Admin. Dist. No. 17,* 754 F.Supp. 906, 919 (D.Me.1990)(setting forth the seven minimum requirements which must be observed in student disciplinary hearings to assure the requisite balance).

The law seeks to counterbalance the tension between two principles. *Goss,* 419 U.S. at 579, 95 S.Ct. 729 (determining the process that is due requires an "accommodation of the competing interests involved."); *Gorman,* 837 F.2d at 13 (same). A university is not a court of law, and it is neither practical nor desirable it be one. Yet, a public university student who is facing serious charges of misconduct that expose him to substantial sanctions should receive a fundamentally fair hearing. In weighing this tension, the law seeks the middle ground.

One factor is the seriousness of the charge and the potential consequences—what the Supreme Court described as the "private interest" affected by the official action. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *accord Gorman,* 837 F.2d at 13. Here, the private interest is compelling. The Plaintiffs faced charges of sexual assault against a fellow student, charges that could have led to their expulsions and did lead to their suspensions. The potential consequences reach beyond their immediate standing at the University. The Supreme Court has noted that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." *Goss,* 419 U.S. at 574, 95 S.Ct. 729 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). The University's decision could "interfere with later opportunities for higher education and employment." *Id.* at 575, 95 S.Ct. 729. The Plaintiffs argue, and this Court accepts, that these charges could "have a major immediate and lifelong impact on [their] personal life, education, employment, and public engagement." [10] Obj. to Mot. for Summ. J. (Docket # 85) at 4. The Plaintiffs also have an interest in avoiding "an erroneous deprivation" of their private interest through the University's procedures. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893; *Gorman,* 837 F.2d at 13.

At the same time, a major purpose of the administrative process and hearing is to avoid formalistic and adversarial procedures. Justice White wrote in *Goss,* "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching

---

10. The same could be said, if not more, for the impact of the alleged assault on the Complainant. However, the focus of this lawsuit and this decision is not on her, but on the Plaintiffs.

process." *Goss,* 419 U.S. at 583, 95 S.Ct. 729. In *Gorman,* the First Circuit advised courts reviewing an educational institution's administrative process of the following:

> In fostering and insuring the requirements of due process, however, the courts have not and should not require that a fair hearing is one that necessarily must follow the traditional common law adversarial method. Rather, on judicial review the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial.
>
> . . . . .
>
> [T]he courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law criminal trial. The question presented is not whether the hearing was ideal, or whether its procedure could have been better. In all cases the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process. In the words of Justice White, "the Due Process Clause requires, not an 'elaborate hearing' before a neutral party, but simply 'an informal give-and-take between student and disciplinarian' which gives the student 'an opportunity to explain his version of the facts.' "

*Gorman,* 837 F.2d at 14, 16 (citations omitted).

### 3. Specific Issues

#### a. Discovery

The Plaintiffs claim the Defendants violated their due process rights by failing to inform them before the hearing of certain evidence: 1) they were not provided with a summary of a statement the Complainant gave to the Old Town Police Department; 2) they were not provided with a witness list before the day of the hearing; and, 3) they were not provided with the Complainant's medical records until the day of the hearing.

#### i. Old Town Police Department Records

Following the June 10, 2002 incident, the Complainant notified the Old Town Police Department, which initiated an investigation. The police officers conducted four interviews of the Complainant: one with Officer Bobbie Pelletier on June 11, 2002; another with Detective Michael Holmes and Officer Debra Holmes on June 11, 2002; a third with Detective Holmes on June 12, 2002; and, a fourth with Officer Holmes on June 13, 2002.[11] SMF ¶ 134. The Plaintiffs assert the records of these interviews contain "important prior inconsistent statements" and call the Complainant's "credibility into serious doubt." Obj. to Mot. for Summ. J. at 13. They also point out the Complainant's attorney argued at the close of the hearing that the Complainant should be believed because her story had been entirely consistent. SMF ¶ 190.

Specifically, the Plaintiffs claim the reports of these interviews differ as to the events of the evening of the incident, the Complainant's consumption of alcohol, who did what to whom, and whether she gave Mr. Minor money after the incident. Obj. to Mot. for Summ. J. at 13–15. The University has admitted that, even though it provided a statement from the Old Town

---

11. These four interviews resulted in three interview statements. This may have been because one of the interviews was considered a continuation of another.

Police Department records to the Complainant's attorney, it provided nothing in the police report to the Plaintiffs.[12] SMF ¶¶ 33, 176. Further, the police department records were not submitted to the Hearing Committee. The Plaintiffs claim the Hearing Committee was left with the erroneous impression that the Complainant had not drunk alcohol before the incident and that her story had been fully consistent throughout. Finally, the Plaintiffs note that the Complainant selectively used their handwritten statements in the police reports to question them during the hearing; however, the Plaintiffs did not have a copy of their own statements.[13] *Id.* ¶ 180.

The Defendants contend there is no due process requirement in a university disciplinary hearing to provide the responding student with exculpatory or impeachment evidence. The Defendants further state the Plaintiffs themselves failed to act prudently to obtain the records from the District Attorney or request a continuance of the disciplinary hearing. Finally, the De-

fendants say the Plaintiffs still received a fundamentally fair hearing.

The Defendants are correct about discovery in university student disciplinary proceedings. Other than the limited notice provisions set forth in *Keene*[14]—requiring that the student be advised of the charges and the nature of the evidence—there is no formal right to discovery. *See Keene*, 316 F.Supp. at 221; *see also Palmer ex rel. Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir.1989)("[M]ore formal procedural safeguards would not sufficiently increase the reliability and fairness of the process to warrant the additional expense and disruption of the educational process."). It is likely the University could have given neither the Complainant nor the Plaintiffs any police documents at all and survived a due process challenge.

The Plaintiffs' point remains, nevertheless, a potentially significant one. This is because the University gave the statement to one side, namely the Complainant, and denied access to the same document to the other side. In view of the nature of the

12. Citing *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir.1992), the Defendants argue the police reports themselves were not verbatim transcripts of the Complainant's statements and, therefore, would have been inadmissible, especially if the Complainant had disputed their accuracy. Defs.' Reply Mem. in Supp. of Defs.' Mot. for Summ. J. (Docket # 94) at 4–5. This argument is difficult to credit. Consistent with its procedure, the disciplinary hearing was not held in accordance with the rules of evidence, and it is highly unlikely, if the police reports had been available, the Chair would have ruled them inadmissible.

13. The thirty-five page police report was faxed to the Complainant's counsel from the local District Attorneys' Office, and its actions, as explained below, are not attributable to the University. *See* SMF ¶ 36.

14. *Keene* may have been modified by subsequent case law. Judge Gignoux decided *Keene* in 1970 after *Dixon v. Alabama State*

*Board of Education*, 294 F.2d 150 (5th Cir. 1961), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), but before *Nash v. Auburn University*, 812 F.2d 655 (11th Cir. 1987). In *Nash*, the Eleventh Circuit clarified that *Dixon* did not require a university to give students facing disciplinary hearings "the names of the witnesses against them and a summary of their expected testimony, when the opposing witnesses will testify in the presence of the accused." *Nash*, 812 F.2d at 662–63. *Dixon* addressed a hearing where the students were not present and, therefore, had to be given the names of the accusing witnesses and a report of their testimony "to ensure the students' ability to respond at a later forum." *Id.* at 663 (citing *Dixon*, 294 F.2d at 155, 159). Here, the *Keene* requirement of prior notice of the nature of the evidence may not apply, because the Plaintiffs were aware of the evidence during the hearing and had an opportunity to respond.

charge and its circumstances, the Hearing Committee was required to determine who to believe. There were only three people in the Complainant's room the night of the incident. The Complainant stated she had consensual sex with Mr. Minor, non-consensual sex with Mr. Gomes, and then non-consensual sex with Mr. Minor; the Plaintiffs agreed they had sexual relations with the Complainant, but said their sexual relations with her were entirely consensual. The credibility of these three individuals ran to the heart of the disciplinary hearing.

The Plaintiffs argue the reports contained substantial evidence of inconsistency in the Complainant's story. They point to the fact that the Complainant made no mention of non-consensual sex with Mr. Minor until the third interview. Further, the police reports reveal the Complainant had consumed some alcohol during the evening leading up to the incident, and the Complainant's medical records, which were before the Hearing Committee, confirmed her use of prescriptive medication, raising the question of the impact of alcohol on the medication. The Plaintiffs also note the Complainant herself had complained in writing that she had found "numerous errors and gross inaccuracies" in the police report and that this written complaint was placed before the Hearing Committee; however, the Hearing Committee never heard what those errors and inconsistencies were, because the records were never made available to either the Hearing Committee or the Plaintiffs. SMF ¶ 149, 150. These issues, as well as certain other mat-

ters, would have at least been appropriate for the Hearing Committee's consideration; however, none of the information in the police reports was presented to the Hearing Committee.[15] In fact, at the hearing, the Complainant was asked no questions at all: none by members of the Hearing Committee and none by the Plaintiffs.

The Plaintiffs argue the hearing generated the misimpression that the Complainant had been entirely consistent from the date of the incident onward. After her statement before the Hearing Committee, the Complainant called four witnesses, each of whom corroborated her version of events. This allowed the Complainant's attorney to argue in his closing statement, "You haven't heard anyone testify to any contradictory statements by [the woman] at all, other than the two Respondents.... There were no inconsistencies in her statements or her testimony or any of the things she stated throughout these proceedings." *Id.* ¶ 190.

Mr. Fiacco's refusal to give the Plaintiffs what he had given the Complainant becomes more potentially significant in light of their respective roles in this proceeding. Under the Code, the Complainant and Mr. Fiacco, as the Officer, assume the roles of presenting the case against the Plaintiffs.[16] Code § V.D.4. Mr. Fiacco and the Complainant had a complete copy of the police report, but the Plaintiffs did not, and Mr. Fiacco had failed to turn documents over to the Plaintiffs when requested to do so. The question is whether a university may, consistent with the requirements of due

---

**15.** During the hearing, the Chair repeatedly made the point that the Hearing Committee did not have the police reports either, implying that this obviated the Plaintiffs' objection. It did not. The Plaintiffs' point is that the police reports contained potentially exculpatory evidence. It is no answer that the Hearing Committee does not have the evidence.

**16.** On September 17, 2002, the Complainant, through her attorney, informed Mr. Fiacco that she did not wish him to present the results of the investigation to the Hearing Committee. SMF ¶ 178. She presented the case herself with the advice of her lawyer.

process, make potentially significant documents available to one side and not the other: to the presenting officer and to the complainant, but not to the students facing serious charges. On its face, the University's actions raise a question as to whether this procedure was fundamentally fair and complied with the basic protections of due process.

The analysis cannot, however, end there. *Gorman* has reminded us not to "impose on educational institutions all the procedural requirements of a common law criminal trial." *Gorman*, 837 F.2d at 16. There are a number of factors to consider: 1) what precisely was given to one side that was not given to the other; 2) timing; 3) the reason the University provided unequal access; 4) the University's role in not supplying the full record; and, 5) the significance of the withheld information.

What was given remains unclear. Mr. Fiacco provided "some of the [police reports] to the Complainant." SMF ¶ 176. This statement of material fact refers to Mr. Fiacco's deposition in which he states that he "shared a component of the report with the woman," the component that "summarized her statement of the events." *Id.* ¶ 176; Fiacco Dep. at 119. There is no clarification as to what "component" was given to the Complainant. This Court cannot assess the impact of an uneven distribution of material unless the Plaintiffs establish what material was distributed.

The timing is constrained. Mr. Fiacco received documents, including the three interview summaries, from the Old Town police records on July 16, 2002. SMF

¶¶ 133, 134. The Complainant orally informed Mr. Fiacco before August 13, 2002 that the police records may contain some inaccuracies. *Id.* ¶¶ 149, 150; Fiacco Dep. Ex. 12. However, the Complainant did not sign an incident report until August 17, 2002. SMF ¶ 2; Costlow Dep. Ex. 6, 7.[17] Mr. Fiacco undertook a formal investigation and referred the matter to the Hearing Committee on September 9, 2002. SMF ¶¶ 4, 5. That same day, the Complainant gave Mr. Fiacco a written statement of the incident and a note that stated there were "numerous errors and gross inaccuracies" in the Old Town Police Department reports. *Id.* ¶ 150. The hearing was initially set for September 16, 2002 and was continued to September 24, 2002 at the Plaintiffs' request. *Id.* ¶ 73.

Between the referral and the hearing, there was a flurry of activity.[18] On September 12, 2002, Mr. Costlow, the Plaintiffs' lawyer, in a telephone conference with in-house University counsel, Nina Lavoie, asked about access through the University to the police reports, and Attorney Lavoie asked Mr. Fiacco to follow up with the Old Town Police Department as to its policy regarding release. *Id.* ¶¶ 101, 102. On September 13, 2002, and again on September 18, 2002, Mr. Fiacco received written requests from the Plaintiffs to produce the documents. *Id.* ¶¶ 162, 163. Attorney Lavoie learned on September 13, 2002 that Mr. Fiacco had handed over either to the Complainant or her attorney the copy of the Complainant's summary statement. Lavoie Dep. at 54–57. On the same day, Attorney Lavoie contacted Deputy District Attorney Mike Roberts and Assistant Dis-

---

17. The parties' references in their statements of material fact to the date the Complainant signed the incident report appear inaccurate; however, it is clear that the Complainant signed incident reports against the Plaintiffs on August 17, 2002. *See* Costlow Dep. Ex. 6, 7.

18. Not all this information is set forth in the parties' statements of material fact; however, at oral argument, this Court confirmed this detailed sequence of events with the parties.

trict Attorney Alice Clifford to determine their office's position on the release of police reports. *Id.* at 56–57. She was concerned Mr. Fiacco's release to the Complainant could have violated a Maine statute. *Id.* at 58; SMF ¶ 101. She also spoke to the Plaintiffs' lawyer, who said he wanted the same material that had been provided to the Complainant. Lavoie Dep. at 57. She then asked Mr. Fiacco whether he intended to give to the Hearing Committee the same material he had given the Complainant; he replied, "no." *Id.* at 63. When Attorney Lavoie attended the hearing on September 24, 2002, she learned Attorney Costlow had never received a copy of the police report, but the Complainant's attorney had. *Id.* at 55.

During the period from September 12, 2002 to September 24, 2002, the Complainant's and the Plaintiffs' attorneys attempted to obtain a complete copy of the police report through the District Attorney's Office. On September 13, 2002, Attorney Costlow wrote to ADA Clifford, requesting the complete police report and complaining the Complainant had been provided with a portion of the police records, but his clients had not. SMF ¶ 100; Costlow Dep. Ex. 16. At 3:55 p.m. on September 20, 2002, ADA Clifford faxed to Attorney Hallett a complete copy of the police report. SMF ¶ 36; Aff. of Alice Clifford ¶¶ 4, 5. The fax sheet indicates that "Gomes/Minor's attys are requesting them as well & they will be sent out to them as well." Fax Cover Sheet attached to Aff. of Alice Clifford. ADA Clifford has a policy of requiring the attorney to whom she is faxing sexual assault materials be present when she faxes the material. Aff. of Alice Clifford ¶ 6; SMF ¶ 37. Although the memories of Attorney Costlow and ADA Clifford conflict in some details, the net effect was Attorney Costlow did not receive the materials from the District Attorney's Office until after the September 24, 2002 hearing.

This chronology reflects the tight deadlines attendant to student disciplinary hearings from complaint to resolution. In *Nash,* for example, the time between the charge and the hearing was only six days, and the students received a restated notice of charges only one day before the hearing. *Nash,* 812 F.2d at 657. Although *Nash* addressed the question of waiver, the Eleventh Circuit concluded the time was "reasonable," because it allowed the students to retain counsel, to successfully argue for more certain notice and a short delay, and to appear at the hearing with supporting witnesses and documents. *Id.* at 662. This tight timeframe, a timeframe not uncommon in university disciplinary hearings, makes it less appropriate to impose strict legal document production requirements on the parties. *See Gorman,* 837 F.2d at 10 (altercations on September 17 and 18; hearing on October 4); *Blanton v. State Univ. of New York,* 489 F.2d 377, 379–80 (2d Cir.1973)(incidents December 2—4; hearing December 18); *Donohue v. Baker,* 976 F.Supp. 136, 145–46 (N.D.N.Y.1997)(telephonic notice of rape charge three days before hearing; written charges one day before hearing). Often, it is the student who requests the expedited hearing to resolve the disciplinary matter with a minimal impact on his education. *See Keene,* 316 F.Supp. at 221 ("At plaintiff's own request, the hearing was held at the earliest possible moment.").

Why did the University not turn over the entire police report? The University was confronted with a provision of Maine statutory law that restricts the disclosure of the police reports. *See* 16 M.R.S.A. § 617 ("Criminal history record information disseminated to a noncriminal justice agency under section 613 shall be used solely for the purpose of which it was

disseminated and shall not be disseminated further."). The police reports constituted "record information" under § 613, and University counsel was concerned that this statute may have prohibited dissemination to any third party, including the Plaintiffs and the Complainant.[19] SMF ¶¶ 101–102. The University, through Attorney Lavoie, made an effort to clarify whether the law prohibited it from releasing material.

What was the University's role? Upon review, the University's actions were not as significant as the Plaintiffs would have them be. It was on September 9, 2002 that Mr. Fiacco gave the Complainant one unidentified statement from the police report, but it was on September 20, 2002, the Complainant received by fax from ADA Clifford a complete copy of the entire police file. The District Attorney's Office is not the University of Maine, and its actions are not attributable to the University.[20] ADA Clifford's uneven distribution of the entire report eclipses the University's uneven distribution of one statement in the report. The Complainant had the entire report one full week ahead of the hearing and her possession of one statement from the report eleven days earlier has not been shown to have had any impact on the hearing. Because the Complainant later obtained the same statement through other sources, the Plaintiffs' claim cannot be based on the Complainant's possession of the statement, but rather must be based solely on their non-possession of this one statement.

What was the impact of the University's actions? This leaves the Plaintiffs' contention that their non-possession of one unidentified statement constituted a denial of due process. Having failed to identify which statement they did not receive, it would be speculative to intuit what effect its non-production had on the proceeding. On the state of the record before it, this Court can draw no conclusions.

Upon analysis, the Plaintiffs' claim of a violation of due process based on the University's failure to distribute a statement in the police report to them before the hearing must fail. Tight time constraints, a general rule against imposing discovery requirements on university disciplinary proceedings, the Complainant's access to the same material from a non-university source, and the Plaintiffs' failure to identify the statement itself require this Court to conclude there is no genuine issue of material fact on the issue of whether the uneven distribution of a statement from the police records constituted a denial of due process.

### ii. The Witness List

■ Several days before the hearing, the Defendants provided a witness list to the Plaintiffs naming the following witnesses: the Complainant, Jessica Libbey, Jacob Pratt, and Amissa Demons. SMF ¶ 15. The Complainant, Ms. Libbey, and Mr. Pratt testified at the hearing; Ms. Demons did not. *Id.* ¶ 19. The Complainant called two additional witnesses—Jerod Edes[21] and Kelly LaPierre—over the

---

19. The record reflects that in-house counsel Nina Lavoie was concerned not only about the release of the police reports to the Plaintiffs, but also about whether Mr. Fiacco's release of the statement in the report to the Complainant constituted a violation of law. It should be noted as well that Mr. Fiacco released the statement to the Complainant before questions about the legality of its release were raised.

20. The Plaintiffs conceded as much at oral argument.

21. Mr. Edes is identified as "Jerry Tompseeds" during his testimony. The Court assumes this is a phonetic error by the transcriber.

Plaintiffs' objections: *Id.* ¶¶ 15, 20. The Complainant described these witnesses as "rebuttal witnesses" to those witnesses the Plaintiffs listed on their September 23rd letter to Mr. Fiacco. *Id.* ¶ 21. Although Mr. Costlow objected to Ms. LaPierre's testimony because she was not on the witness list, he acknowledged whether to allow her to testify was "at the discretion of the chair." *Id.* ¶ 22. Ms. LaPierre and Mr. Edes testified in the presence of the Plaintiffs, and the Plaintiffs had an opportunity to cross-examine them. *Id.* ¶ 23.

Mr. Costlow was correct in acknowledging the Chair's discretion.[22] If this hearing had been before a court, the judge would have had the discretion to allow or exclude the testimony of unlisted witnesses. *See Alberty–Velez v. Corporacion De Puerto Rico Para La Difusion Publica*, 242 F.3d 418, 423 (1st Cir.2001)(an appellate court generally should not interfere with a trial court's decision to admit or exclude evidence based on its interpretation of its own pretrial order); *Geremia v. First Nat'l Bank of Boston*, 653 F.2d 1, 5 (1st Cir.1981)(where memorandum designating nine "contested issues of law and fact," which had been signed by both sides and filed with the court, was never specifically adopted by the court, any purported preclusion of issues therein could not be viewed as restricting the court's considerable discretion in an area). A trial judge's decision to allow the Government to call a rebuttal witness in a criminal trial is reviewed for abuse of discretion. *Goldsby v. United States*, 160 U.S. 70, 74, 16 S.Ct. 216, 40 L.Ed. 343 (1895); *United States v.*

*Jalbert*, 504 F.2d 892, 893 (1st Cir.1974). The decision to allow the testimony of unlisted witnesses would have been upheld in a judicial proceeding and was well within the Chair's discretion as presiding officer at the disciplinary hearing.

Moreover, due process in the context of academic discipline does not necessarily require students be given a list of witnesses and exhibits prior to the hearing, provided the students are allowed to attend the hearing itself. *Nash v. Auburn Univ.*, 812 F.2d 655, 662–63 (11th Cir. 1987)("[W]e did not require in *Dixon* that students facing a hearing on charges of misconduct be given the names of witnesses against them and a summary of their expected testimony, when the opposing witnesses will testify in the presence of the accused."). Because Ms. LaPierre and Mr. Edes testified in the presence of the Plaintiffs, it was not a due process requirement to give the Plaintiffs their names and a summary of their expected testimony before the hearing. *Cf. Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 159 (5th Cir.1961), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961)(because university students were not present to hear the evidence against them, they should be given the names of the accusing witnesses and a report of their testimony to ensure the students' ability to respond at a later forum).

The Plaintiffs attempt to distinguish this case from *Nash* and *Dixon* by arguing that the charge here is much more serious than in *Nash* (academic dishonesty) and *Dixon* (unspecified charges).[23] This Court does

---

**22.** Although not noted by the parties, the Chair allowed the Plaintiffs to call Mr. Fiacco as a witness, even though he was not listed on the Complainant's or their witness lists. Hearing Committee Binder at SCC 105, 117.

**23.** Although the charges against the students in *Dixon* were never specified, the students

were all African–Americans, who in 1960 entered as a group into a publicly owned lunch grill in the basement of the county courthouse in Montgomery, Alabama, and after service was refused and the police arrived, they were ordered into the corridor of the courthouse, where they stayed for approximately one hour. *Dixon*, 294 F.2d at 152.

not minimize the seriousness of the charge of sexual assault. But, under a due process analysis, distinguishing between charges of academic dishonesty and sexual assault slices too thin a due process argument. It would require nuanced judgments about gradations of seriousness among differing charges and a perilous attempt to translate tonal levels of gravity to sets of due process rights.[24]

Instead of focusing solely on the charge, courts have looked at the potential sanction. *Gorman*, 837 F.2d at 13 ("[T]he federal courts have uniformly held that fair process requires notice and an opportunity to be heard before the expulsion or significant suspension of a student from a public school.") In *Nash*, Auburn University imposed a sanction virtually identical to the sanction the Plaintiffs in this case received.[25] The students in *Dixon* received harsher treatment and were expelled from Alabama State College. *Dixon*, 294 F.2d at 151 n. 2. Whether the hearing was fair "depends upon the nature of the interest affected and all of the circumstances of the particular case." *Gorman*, 837 F.2d at 13. This Court cannot conclude that because the Plaintiffs were charged with sexual assault, the due process clause requires they be supplied in advance with a witness list, when those students are present at the hearing and have the right to listen to the statements and ask questions. Further, it cannot conclude the due process clause mandates that if a witness is not listed, the chair's discretionary determination to allow that witness

to present a statement raises a constitutional concern.

### iii. The Medical Reports

■ The Plaintiffs object to the Complainant's introduction at the hearing of medical records not available to them until the morning of the hearing. The medical records were provided to the Hearing Committee and the Plaintiffs the morning of the hearing. SMF ¶ 28. Mr. Fiacco made copies of the records and included them in all hearing binders, including the Plaintiffs' binder. *Id.* ¶ 29. Mr. Costlow had the opportunity to review the reports before the start of the hearing. *Id.* ¶ 30.

The Plaintiffs make an argument similar to one the Eleventh Circuit rejected in *Nash*. Here, the Plaintiffs argue, if they had received prior notice of the medical records, they would have had the opportunity to "discuss them with [a] medical professional." Obj. to Mot. for Summ. J. at 14. The students in *Nash* were charged with cheating. At the hearing, they were confronted by their professor and other professors who testified there was such a striking similarity among the student responses, it was likely there had been collusion. *Nash*, 812 F.2d at 660. The students argued unsuccessfully that if they had known of this analysis in advance, they could have obtained "expert, statistical testimony to rebut the inference that they cheated." *Id.* at 662. In rejecting this argument, the *Nash* court stated that the students were "not constitutionally entitled

---

24. This is not to say that all charges, where the student is subject to significant discipline, require the same level of due process. The Supreme Court pointed out in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), there is a difference between the failure of a student to meet academic standards and the violation of valid rules of conduct, stating this "difference calls for far less strin-

gent procedural requirements in the case of an academic dismissal."

25. *Nash* states the board decided unanimously the students were guilty of the charge of academic dishonesty and recommended they be suspended, subject to the right to reapply for admission in one year. *Nash*, 812 F.2d at 658.

to advance notice of statements by witnesses who ... were to appear at the hearing." *Id.* at 663.

Advance notice of exhibits is indistinguishable from advance notice of witnesses. For the same reasons, due process does not require students be given a list of exhibits before the hearing if the students attend the hearing. Because the Plaintiffs attended the hearing, it was not necessary for the Complainant to notify them about the medical records she intended to submit Furthermore, the record demonstrates the Plaintiffs were given an opportunity to review the medical records before the hearing and to question the Complainant about those records during the hearing.[26] SMF ¶ 31. Finally, this Court is doubtful that the incrementally enhanced fairness of the hearing from advanced notice of exhibits would justify opening a rich source of potential controversy. Instead of addressing the main event—whether a violation of the Code occurred—the Hearing Committee would inevitably become enmeshed in charges and countercharges of discovery violations, controversies a university hearing committee is ill-equipped to resolve. *See Goss*, 419 U.S. at 583, 95 S.Ct. 729.

### b. Exclusion of Prior Sexual History

■ The Plaintiffs' due process argument on the Hearing Committee's handling of prior sexual history is elusive. The Plaintiffs do not challenge the University's rule excluding reference to the Complainant's past sexual history. To the contrary, they concede it is "certainly a reasonable rule." Obj. to Mot. for Summ. J. at 18. They could hardly claim otherwise. *See* Fed.R.Evid. 412; Me. R. Evid. 412. Instead, they attack the admission of certain testimony and the exclusion of other testimony. In the Hearing Committee's packet was a written statement from Jerod Edes, which stated in part: "I know for a fact that [the Complainant] would never consent to anything such as what happened to her.... I never believed, and will never believe that [the Complainant] would partake in anything of the sort." SMF ¶ 194. The Plaintiffs argue that by including this statement in the Hearing Committee's packet, which discounted the possibility the Complainant would have voluntarily engaged in simultaneous sex with two men, the University turned "this rule from a shield to a sword." Obj. to Mot. for Summ. J. at 18. They contend they had evidence the Complainant had, in fact, done so in the past.[27] They argue, because Mr. Fiacco was aware of this countervailing evidence, he should not have included the Edes statement in the Hearing Committee packet, knowing it was irrefutable under the rule that precluded prior sexual activity.

First, the Plaintiffs knew the Edes statement was included in the Hearing Committee packet and failed to raise any specific objection to the written statement at the hearing.[28] SMF ¶¶ 58, 59. In any

---

**26.** The record shows the Plaintiffs failed to ask the Complainant any questions. SMF ¶ 32. The Plaintiffs argue strenuously that, absent a medical professional, they could not have known the significance of the medication she had taken that day. However, they made no effort to ask the Complainant herself anything about the prescriptive medicine: what the medications were for, when she had taken the medicine, whether she had drunk

any alcohol, and whether the medicine had any warnings against ingestion of alcohol.

**27.** Because someone wrote a statement saying the Complainant had done so does not make it any more or less true than Mr. Edes's written statement saying she would never do so.

**28.** The Plaintiffs denied they failed to object to the inclusion of the Edes statement in the

event, the Plaintiffs make far too much of Mr. Edes's written statement. The written statement is a character reference, not a statement of personal knowledge.[29] As a friend of the Complainant, Mr. Edes had a basis for his opinion about her character and what she likely would or would not do, but Mr. Edes could not know what the Complainant actually did or did not do in all her private moments. Moreover, there is no showing this statement in any way influenced the Hearing Committee.[30] Mr. Edes did not repeat his character opinion during his testimony, and the written statement was never expressly mentioned during the hearing. Finally, even if the Hearing Committee considered the statement and gave it some weight, the Plaintiffs have failed to demonstrate a due process violation took place.

Second, the Plaintiffs point to the Complainant's testimony about a prior sexual encounter she had with another football player and the impact it had on her relationship with Mr. Minor. She said one week before the incident she had told Mr. Minor that another football player had sexually assaulted her. *Id.* ¶ 56, 199. After this conversation, she noticed Mr. Minor's attitude toward her had "changed drastically." *Id.* ¶ 56. When she began to discuss this at the hearing, Mr. Minor objected. *Id.* The Hearing Committee, however, could not have known what the Complainant's testimony was going to be and, in the same sense that a court receives evidence *de bene*, the Hearing Committee heard the testimony to determine whether it was proper. Once the Complainant made the statement, Chair Allan responded: "[L]et's try to focus on the events of this evening, any questions in particular because we have already made the announcement that we are not going to consider any past sexual history. Okay." *Id.* This interchange is as close a lay chair could be expected to come to ruling the evidence inadmissible and striking it.[31] In these circumstances, it is difficult to ferret out a plausible due process violation.[32]

### c. Partition

■ The hearing room had three tables: two for the parties and a long table in

---

Hearing Committee binders. SMF ¶ 59. They point to their "blanket objection requesting that some witnesses and exhibits be excluded" and Mr. Minor's objection to Mr. Edes's testimony on the ground that he did not have personal knowledge of the events that evening. *Id.* This Court has reviewed the Plaintiffs' citations to portions of the transcript of the hearing and concludes there is no evidence that the Plaintiffs ever objected to the inclusion of the Edes statement in the Hearing Committee's binders. Statement of material fact 59 is deemed admitted over the Plaintiffs' denial.

29. Mr. Edes himself described his letter as a character reference. The Edes letter was included in the Hearing Committee packet and followed a note from Mr. Edes to Mr. Fiacco and the Complainant, which read: "Dave, this is a character reference that [the Complainant] asked me to write up and type for you." SMF ¶ 57; Fiacco Dep. Ex. 9, 10. The Plaintiffs admit the Edes letter "contained a character reference," but differentiate "references to Complainant's prior sexual history." SMF ¶ 57. In the context of the Edes letter, this Court does not accept the Plaintiffs' distinction.

30. The Plaintiffs are correct that evidence the Complainant had not engaged in multi-partner sexual activity is as much a statement of prior sexual history as a statement that she had done so. But, there is no evidence the Hearing Committee exempted the Edes written statement from its prior rulings.

31. Dr. Allan reiterated her ruling on the exclusion of prior sexual history throughout the hearing. SMF ¶ 56, 193.

32. In *Cloud v. Trustees of Boston University*, 720 F.2d 721, 725 (1st Cir.1983), the First Circuit Court of Appeals characterized as "spurious" the argument that the hearing examiner selectively used the rules of evidence.

front for the Hearing Committee. A screen was placed between the Complainant's and the Plaintiffs' tables. *Id.* ¶ 44. Initially, when seated at their table, the Plaintiffs and their attorney could not see the Complainant or her attorney, and they objected to the arrangement. *Id.* ¶¶ 45–46. Mr. Fiacco asked the Plaintiffs if they would waive their due process rights to confront the Complainant,[33] *Id.* ¶ 52. When they refused, the arrangement was changed, and the witness chair was placed directly in front of the screen, facing the Committee members. *Id.* ¶¶ 47, 52. The Complainant's back and profile were visible from the Plaintiffs' table. *Id.* ¶¶ 47, 48. At some point during the Complainant's testimony, Mr. Costlow moved to a different part of the room to get a better view of the Complainant's face. *Id.* ¶ 49. The Plaintiffs assert the physical partition violated due process because they were forced to choose between two fundamental rights: "(1) confronting their accuser, at least through their counsel; and, (2) having counsel beside them to advise them as they heard the witness and cross-examined her." Obj. to Mot. for Summ. J. at 20.

In *Cloud v. Trustees of Boston University,* 720 F.2d 721 (1st Cir.1983), Boston University presented six witnesses, one of whom was permitted to testify outside of Cloud's sight because of her professed fear of him. *Id.* at 724. Cloud asserted this shielded testimony violated the guarantee of "the right to confront and cross examine any witness." *Id.* at 725 (citation and in-ternal punctuation omitted). The First Circuit rejected this argument, holding that Cloud was given an opportunity to cross-examine the witness and his attorney and the Judicial Committee were permit-ted to view the witness. *Id.*

Here, the Plaintiffs were afforded an opportunity to see more of the Complain-ant than Cloud was. The Hearing Com-mittee required all witnesses to be visible to the Plaintiffs while testifying. SMF ¶ 46. The Plaintiffs admit they could see the Complainant's profile during her testi-mony and were given an opportunity to cross-examine the Complainant and her witnesses. *Id.* ¶¶ 48, 51. Under these circumstances, there is no due process vio-lation. *See Cloud,* 720 F.2d at 725 (the hearing examiner's decision to permit the witness to testify out of Cloud's sight be-cause of her frightened and nervous state did not render the hearing unfair or violate any contractually required procedures).

The Plaintiffs also claim they were de-prived of their right to counsel, arguing their attorney was forced to choose be-tween seeing the Complainant testify and advising them. This argument assumes the Plaintiffs had a right to counsel at the disciplinary hearing. In *Gorman,* howev-er, the First Circuit noted that the "weight of authority is against representa-tion by counsel at disciplinary hearings, unless the student is also facing criminal charges stemming from the incident in question."[34] *Gorman,* 837 F.2d at 16; *see*

---

**33.** The Plaintiffs' claim the request is indica-tive of the "Defendants' awareness of the due process implications of their acts and omis-sions." Obj. to Mot. for Summ. J. at 30.

**34.** *Gorman* cites *Wasson v. Trowbridge,* 382 F.2d 807 (2d Cir.1967), which explains:

The requirement of counsel as an ingredi-ent of fairness is a function of all of the other aspects of the hearing. Where the proceeding is non-criminal in nature, where the hearing is investigative and not adversarial and the government does not proceed through counsel, where the indi-vidual concerned is mature and educated, where his knowledge of the events ... should enable him to develop the facts ade-quately through available sources, and where the other aspects of the hearing tak-en as a whole are fair, due process does not require representation by counsel.

*also Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir.1993); *Henson v. Honor Comm. of Univ. of Virginia.*, 719 F.2d 69, 74 (4th Cir.1983). On the other hand, in *Gabrilowitz v. Newman*, 582 F.2d 100 (1st Cir. 1978), the First Circuit held a student has a right to counsel in a university disciplinary hearing, when there is a pending criminal charge involving the same incident. *Id.* at 107. *Gabrilowitz* limited the attorney's role to safeguarding the student's rights at the criminal proceeding, not affecting the outcome of the disciplinary hearing.[35] *Id.* at 106. *Gabrilowitz* emphasized this limited right to counsel would be applicable "only for a truly unusual situation." *Id.* Here, Mr. Gomes and Mr. Minor were the subjects of a police investigation, but no formal charges had been brought. The District Attorney's Office, however, had not confirmed it would not bring charges against them. SMF ¶ 165. This Court will assume, without deciding, that Mr. Gomes and Mr. Minor had the limited right to counsel, because of the pending police investigation of the incident that formed the basis of the disciplinary hearing.

The Plaintiffs contend Mr. Costlow was presented with an untenable choice: between consulting with his clients and observing the proceedings. His choice, however, was not so stark. The Plaintiffs acknowledge they could see the Complainant's profile and Mr. Costlow "moved to a different part of the room in order to get a view of the Complainant's face and demeanor." Obj. to Mot. for Summ. J. at 20. Mr. Costlow was, therefore, not prevented from seeing the Complainant from counsel table. He simply had a better view elsewhere and decided to take it. SMF ¶ 49.

Moreover, the attorneys' role in the disciplinary hearing was much more circumscribed than in a court room. The attorneys were allowed to be present, to advise their clients, and to give a final summation. On rare occasions, they were permitted to address objections to the Chair. They were not, however, allowed to question witnesses or otherwise directly participate. The Hearing Committee for the most part allowed questioning of witnesses only through the Chair.[36] The University's process tracked the process the First Circuit approved in *Gabrilowitz*. *See Gabrilowitz*, 582 F.2d at 106–07; *see also Nash*, 812 F.2d at 664.

Finally, there is no showing that the Plaintiffs were affected by their lawyer's decision to move away from counsel table for a portion of the Complainant's testimony.[37] To the contrary, Mr. Minor, as noted

---

*Wasson*, 382 F.2d at 812; *see also Jaksa v. Regents of Univ. of Michigan*, 597 F.Supp. 1245, 1252 n. 8 (E.D.Mich.1984), *aff'd*, 787 F.2d 590 (6th Cir.1986).

35. *Gabrilowitz* stated that counsel's principal functions would be to advise the student whether he should answer questions and what he should say to safeguard him from self-incrimination and to observe the hearing to be better prepared to represent the student at the criminal proceeding. *Gabrilowitz*, 582 F.2d at 106. To fulfill these functions, the First Circuit noted that counsel need speak to no one but the student, but should be available to consult with him at all stages of the hearing, especially when the student is being questioned. *Id.*

36. For the most part, questions were directed to the Chair, who then asked the question to the witness. On occasion, this process broke down and the witness answered questions directly. However, in no case did an attorney question a witness directly.

37. It is also significant that Mr. Costlow moved away from counsel table during the Complainant's testimony, but apparently was available during his clients' statements. *Gabrilowitz*'s primary concern was that counsel be available to the student when he testifies to protect his rights against self-incrimination. *Gabrilowitz*, 582 F.2d at 106. Here, there is no assertion the Plaintiffs did not have the benefit of counsel as they addressed the Hear-

earlier, objected to the Complainant's recitation of prior sexual history, and the Plaintiffs have not pointed to any specific question, objection, or evidence they claim was affected by their lawyer's decision to leave counsel table.

By partitioning the room, but allowing the Plaintiffs a limited view of the Complainant, the Hearing Committee fashioned precisely the type of "protective ruling" contemplated by *Cloud,* balancing the need for the Complainant to be free of intimidation against the Plaintiffs' right to due process. Allowing the presence, but not the active participation of counsel, the Hearing Committee complied with *Gabrilowitz.* There is no due process violation from the partition and location of the Complainant during her testimony.

### d. Impartial Tribunal

█ The Plaintiffs make two claims of bias against the Hearing Committee: 1) they assert the Chair, Dr. Allan, was biased due to her involvement with rape response and victim advocate programs;

and, 2) they claim they were denied the right to voir dire members of the Hearing Committee.

Turning to Dr. Allan, they allege she was biased because, at the time of the hearing, she was a board member of the Rape Response Services of Penobscot and Piscataquis Counties, which is a sexual assault victim advocacy organization, had been affiliated with and supported other rape response and victim advocate organizations, and had participated in a number of other organizations such as the Safe Campus Task Force and the Women's Studies Advisory Committee.[38] Obj. to Mot. for Summ. J. at 9; SMF ¶¶ 83, 209–10.[39]

Second, in a letter[40] dated September 17, 2002, Mr. Costlow asked to voir dire the members of the Hearing Committee on the issue of bias for or against the football team if the Complainant were allowed voir dire.[41] SMF ¶ 213; Costlow Dep. Ex. 22. In the same letter, Mr. Costlow explained, if the Complaint were allowed voir dire, he

---

ing Committee. The secondary concern was that counsel be apprised of the evidence at the hearing to allow better representation at any subsequent criminal proceeding. *Id.* Here, Mr. Costlow achieved this objective by moving his chair to obtain a better view of the Complainant as she testified. Both *Gabrilowitz* concerns were met in this case.

**38.** In support of their allegation, the Plaintiffs highlight Dr. Allan's testimony that it is common for a rape response service organization or victim advocate organization, such as Rape Response Services, to take the view: "If a woman complains of rape, believe her. To question her is to make her the victim." SMF ¶ 207. Dr. Allan nowhere says she thought this aphorism established a standard to be applied during a disciplinary hearing to determine whether a sexual assault had occurred.

**39.** The Plaintiffs also point out that the Complainant testified she was trained at Rape Response Services. SMF ¶ 208. There is, however, no intimation Dr. Allan trained the

Complainant and no evidence that the Complainant's training influenced Dr. Allan.

**40.** The letter was faxed. SMF ¶ 214; Allan Dep. Ex. 2.

**41.** The Defendants have made the point that Mr. Costlow's letter asked for voir dire only if the Plaintiffs were accorded the same right. Mr. Costlow's letter reads: "The complainant by and through her counsel are basically seeking voir dire of the members of the disciplinary committee because they may have a bias for or against the football team. *Should voir dire be allowed* respondent would seek the same opportunity . . . ." Costlow Dep. Ex. 22 (emphasis added). The Defendants note the Hearing Committee denied voir dire to the Complainant and, therefore, the Plaintiffs' request, as phrased, never became effective. This is technically true and provides another basis for rejecting the Plaintiffs' claim, because they never effectively requested the relief they now claim they were denied.

would explore "whether any member had personal experience with sexual assault or had worked in a facility or in an advocacy group for sexual assault victims." *Id.* Dr. Allan testified she never received or saw the faxed letter until several weeks before her deposition.[42] SMF ¶ 214.

By letter dated September 17, 2002 and signed "Elizabeth J. Allan/s," Mr. Costlow's request for voir dire was denied:

Questioning of the Committee members is not permitted, although the parties are entitled to know the names of the Committee members. Challenges for bias may be made. Committee members have been instructed to tell the Chairperson if they are unable to judge the case fairly and solely on the evidence presented.

All parties have the right to · challenge for cause any member of the Committee by submitting to a designated official a written memorandum stating the grounds for· this challenge at least two days prior to the scheduled meeting. Removal of members for cause shall be within the authority and at the discretion of the Chair of the Committee or another member of the Committee if the Chair is unable to exercise that function or is challenged for cause.

*Id.* ¶ 215; Allan Dep. Ex. 3. Although ostensibly signed by Dr. Allan, she neither wrote nor signed it. SMF ¶ 216. Instead, Mr. Fiacco wrote the draft in consultation with legal counsel "in the usual course of action." *Id.* Mr. Fiacco's administrative assistant signed Dr. Allan's name. *Id.* ¶ 218. Dr. Allan did not recall seeing Mr. Costlow's letter, but Mr. Fiacco told her that the letter requested the right to voir dire members of the Hearing Committee, that the same request had been denied to counsel for the Complainant, and that 'the

issue had been discussed with University legal counsel. *Id.* ¶¶ 217, 219. Mr. Fiacco did ´ not tell Dr. Allan that information about specific types of bias, namely football players and sexual assault, had been requested. *Id.* ¶ 220. During Dr. Allan's deposition, she testified it is unlikely her membership on the board of Rape Response Services would have caused her to recuse herself. *Id.* ¶ 221.

The Plaintiffs contend Dr. Allan violated their constitutional right to an impartial tribunal in three respects:

First, a reasonable official with Allan's organizational affiliations would have permitted an inquiry into bias. Allan does not recall seeing Costlow's letter requesting an inquiry.... Nevertheless, she must be charged with knowledge of its contents and failure to act because a reasonable official with responsibility for addressing bias issues and ensuring an impartial tribunal, upon learning about the letter, would have obtained it, read it and acted on it.

Second, due to Allan's professional involvement with and support of organizations focused on sexual assault victim advocacy and her other extensive involvement in issues directly related to the allegations before the [Hearing Committee], it was a violation of Plaintiffs' due process rights for her to continue on the [Hearing Committee]. A reasonable official with Allan's professional involvements would not sit on a committee in judgment of a sexual assault matter without the informed consent of the accused students.

Third, Allan made no inquiry about bias regarding the other members of the [Hearing Committee]. In the face of Plaintiffs' request, she had a duty to ask. She testified that she believed none

---

42. Dr. Allan's deposition took place on May ´25, 2004.

were biased, but there was no basis for her knowledge.... Again, given that Plaintiffs had made a reasonable inquiry, the only reasonable response was to ask the others and permit the inquiry to proceed.

Obj. to Mot. for Summ. J. at 11.

"[A]n impartial and independent adjudicator 'is a fundamental ingredient of procedural due process.'" *Gorman,* 837 F.2d at 15 (citation omitted); *see also Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). "Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Duke v. N. Texas State Univ.,* 469 F.2d 829, 834 (5th Cir.1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973); *accord Gorman,* 837 F.2d at 15. "Generally, in examining administrative proceedings, the presumption favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption." *Gorman,* 837 F.2d at 15; *see also Hill v. Bd. of Trs. of Michigan State Univ.,* 182 F.Supp.2d 621, 628 (W.D.Mich.2001)("[I]n a university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias."). *Nash* required "[a]ny alleged prejudice on the part of the board must be evident from the record and cannot be based in speculation

or inference." *Nash,* 812 F.2d at 665; *accord Roach v. Univ. of Utah,* 968 F.Supp. 1446, 1452 (D.Utah 1997).

The Plaintiffs have failed to raise a genuine issue of material fact as to the Hearing Committee's or Dr. Allan's impartiality. They have proffered no evidence of actual bias,[43] and, under *Nash,* the Plaintiffs have failed to present evidence of bias from the record.[44] Nevertheless, the Plaintiffs suggest Dr. Allan was biased per se because of her membership on the board of the Rape Response Services and she should have disclosed her membership on the board and stepped down as Chair. However, Dr. Allan claimed her role on the board was limited to giving advice to the director of the organization on financial matters. SMF ¶ 82. She also testified she was not involved in advocacy work nor had direct knowledge of the day-to-day operations of the organizations. *Id.*

Moreover, it is difficult to take seriously the Plaintiffs' claim of bias. After all, Dr. Allan's volunteer activity has been directed against sexual assault, which is a crime and a violation of the Code. There is not exactly a constituency in favor of sexual assault, and it is difficult to imagine a proper member of the Hearing Committee not firmly against it. It is another matter altogether to assert that, because someone

---

**43.** When asked at his deposition if he had any information that would allow him to conclude the members of the Hearing Committee were biased or prejudiced, Mr. Gomes responded, "I don't know that." SMF ¶ 74. Mr. Minor said it made him "a little uneasy" when he discovered Dr. Allan's affiliations. *Id.* ¶ 75. When asked to give an example of bias, Mr. Costlow testified generally that Dr. Allan had allowed in too much "irrelevant prejudicial information ... demonstrating to me bias and/or lack of understanding of relevancy and its limits." *Id.* ¶ 76.

**44.** The record establishes that Dr. Allan ruled against the Complainant on a number of occasions. For example, Dr. Allan overruled the Complainant's objection that she had to be visible to the Plaintiffs when testifying at the hearing; she determined that the Complainant should not call her mother to testify because such testimony would be redundant; she stopped one of the Complainant's witnesses from testifying that the Complainant and Mr. Minor had intercourse a few days before this event; and after a fellow committee member referred to the incident as rape, Dr. Allan referred to it as the "alleged incident." SMF ¶¶ 77–80.

is against sexual assault, she would be unable to be a fair and neutral judge as to whether a sexual assault had happened in the first place. To the contrary, the record of the hearing reflects, instead of treating the claim as proven, Dr. Allan's chairmanship of the Hearing Committee was characterized by even-handedness and neutrality. The Plaintiffs have failed to make a showing that, as a result of her experience and affiliations, Dr. Allan demonstrated any bias against them during the hearing.

Finally, the University's decision not to allow voir dire is consistent with the Code, which does not permit voir dire, but does permit challenges for cause.[45] *Id.* ¶ 114. The parties were advised at the outset of the hearing of their right to challenge for cause, but the Plaintiffs made no challenge. *Id.* ¶¶ 115–16. Allowing challenges for cause, but not voir dire, reduces the risk the committee hearing will be transformed into a full blown trial. On the other hand, if the parties are aware of reasons that would disqualify a committee member, they are allowed to bring them forward.[46] Striking this balance, the University has not violated the due process clause.

### e. Substantial Evidence

The Plaintiffs contend a genuine issue of material fact exists regarding whether the Hearing Committee found the Plaintiffs to be a threat to the community, and therefore, whether its refusal to stay punishment pending appeal was based on substantial evidence.[47] Code § V.D.4.k. ("Any disciplinary sanctions imposed by the Committee shall be operative immediately upon notification, unless otherwise specified, or unless the Respondent appeals under Section V.E. below in which case sanctions will be stayed unless deemed necessary for the protection of other persons."). Once the Hearing Committee determined the Plaintiffs had together sexually assaulted a female student, it is beyond argument that they had to be removed from campus. The Plaintiffs' argument that, despite the fact they had been found to have committed a sexual assault against a fellow student, they should have been allowed to remain on campus during the appeals process defies common sense and is simply frivolous.

---

**45.** It is clearly not the best practice for Mr. Fiacco to have written a response under Dr. Allan's name without her permission or knowledge. However, there is no indication his decision on her behalf was contrary to University policy or applied unevenly. The University received voir dire requests from the Complainant and the Plaintiffs and rejected each. SMF ¶ 212. The rejection is consistent with the provisions of the Code. *Id.* ¶ 114.

**46.** An example is the Complainant's challenge for cause. One of the Hearing Committee members arrived wearing a football jersey and she questioned whether this demonstrated bias in favor of the Plaintiffs. After the Hearing Committee member explained he had been asked to participate in the hearing that very day after he was already dressed, she withdrew her objection. SMF ¶ 116.

**47.** The Plaintiffs base their argument on some contradictory statements in Dr. Allan's deposition. At one point, Dr. Allan testified she did not believe the Hearing Committee "found specific evidence" that the Plaintiffs posed a threat to the community. SMF ¶ 228. After a brief recess, the Defendants' attorney announced Dr. Allan wished to correct her prior testimony, after which Dr. Allan testified, "the committee did discuss [the Plaintiffs'] behavior as a threat to the kind of community that we expect to have at the University of Maine." *Id.* ¶ 229. The Plaintiffs nowhere explain why the University should be compelled to keep on campus individuals it has found committed a sexual assault. Removing them from campus is a decision the wisdom of which is beyond argument.

### f. Appeals Process

### i. Limited Appeal

In the two University administrative appeals, the appeal officials reviewed the hearing for procedural errors and the sanctions for appropriateness. SMF ¶¶ 10, 12. The Plaintiffs assert that, because the appeals officials did not review what they term the "merits of the sanctions"—referring to whether the evidence supported the sanction—the appeals violated due process. Obj. to Mot. for Summ. J. at 23. The Plaintiffs draw a distinction between appellate review of the procedure and the appropriateness of the sanction and appellate review of whether the evidence supported the sanction:

> There could be no meaningful review of fundamental fairness and due process without a consideration of the merits of the sanctions. Due process requires that a student not be punished except on the basis of substantial evidence.... It is not possible to afford due process or fundamental fairness without considering whether there was substantial evidence [to punish the Plaintiffs].

*Id.* at 23.

■ The short response is that a student has no constitutional right to review or appeal after a disciplinary hearing which satisfied the essential requirements of due process. *Winnick v. Manning*, 460 F.2d 545, 549 n. 5 (2d Cir.1972). The right of appeal is not a constitutional right. *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956), *reh'g denied*, 351 U.S. 958, 76 S.Ct. 844, 100 L.Ed. 1480 (1956)("It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate

review at all."); *United States v. Puzzanghera*, 820 F.2d 25, 26 (1st Cir.1987), *cert. denied*, 484 U.S. 900, 108 S.Ct. 237, 98 L.Ed.2d 195 (1987)("It is well established that there is no constitutional right to appellate review even in criminal cases."). If the Plaintiffs had no constitutional right to any appeal, they do not raise a question of constitutional dimensions by complaining their appeal was limited in scope.[48]

### ii. *Ex Parte* Contacts

The Plaintiffs contend the appeal process was fatally tainted by two sets of ex parte communications. The Plaintiffs assert:

> [A]fter blowing their opportunity to conduct a fair hearing, the Defendants added insult to injury on the appeal by allowing Fiacco and University counsel Todd Cabelka to hijack the deliberations of the Appeal Committee behind the backs of the Plaintiffs and their lawyers, resulting in a complete failure of any meaningful appellate review.

Obj. to Mot. for Summ. J. at 25.

### (a) David Fiacco's *Ex Parte* Contact

■ The Appeal Committee began its work in early October 2002. SMF ¶ 233. On October 8, 2002, the Plaintiffs submitted a document entitled "Statement of Specific Points on Appeal." *Id.* ¶ 231; Costlow Dep. Ex 48, 49. This document raised ten specific issues, three of which were directed to Mr. Fiacco's role: 1) his withholding of the Old Town Police Department report from the Plaintiffs while providing it to the lawyer for the Complainant; 2) his obligation as the Officer to disclose the police report to the Plaintiffs and to the Committee; and, 3) his dual

---

**48.** *Griffin* says that if a State grants appellate review, it must not do so in a way that discriminates against some convicted defendants on account of their poverty. *Griffin*, 351 U.S.

at 18, 76 S.Ct. 585. But, the Plaintiffs have not asserted they were denied an appeal on impermissible grounds, only that the scope of issues on appeal was too restrictive.

role as prosecutor and guardian of fair play. *Id.* The remaining seven issues touched less directly on Mr. Fiacco's conduct of the investigation and role at the disciplinary hearing. *Id.* The Appeal Committee knew as of October 8, 2002, or shortly thereafter, that the Plaintiffs had focused their appeal in part on Mr. Fiacco's actions.

Nevertheless, possibly with the assistance of University counsel, Todd Cabelka, the Appeal Committee put together a list of questions for Mr. Fiacco. SMF ¶ 238. The questions covered many of the same subjects in the Plaintiffs' "Statement of Specific Points on Appeal" and included the following subjects:

1. the standard practices for gathering evidence and exhibits and preparing and presenting material for both the complainants and respondents before the hearing;

2. timing of witness lists and whether witnesses may be added the day of the hearing;

3. the procedures in place for determining the role of the conduct officer to advocate for the parties;

4. whether the conduct officer must provide respondent access to all information presented to the committee before the hearing;

5. the procedures in place for providing respondent access to information which will be presented to the committee;

6. the procedures in place for providing respondent access to information gained during the conduct officer's investigation phase;

7. the procedures in place for providing complainant access to information gained during the conduct officer's investigation phase;

8. the procedures governing the conduct officer's determination of what information is provided to complainant, respondent, and committee and when it is provided;

9. the procedures in place for determining information provided to the committee;

10. the procedures for determining the level of sanctions;

11. the procedures for recording the committee hearing;

12. the procedures for establishing witness lists and notification of witnesses;

13. the procedures for notification of witness lists to the complainant and respondent; and,

14. the procedures for the submission of supporting documentation for the complainant and respondent

Whelan Dep. Ex. 6. Mr. Fiacco responded in writing to the Appeal Committee, but his response was not made available to the Complainant or the Plaintiffs. SMF ¶ 239.

The Plaintiffs raise three issues: 1) they argue Mr. Fiacco's contact with the Appeal Committee constituted an *ex parte* contact violative of due process; 2) they contend "Mr. Fiacco's responses ... went far beyond a general description of procedures and took on a distinctly adversary tone towards the Respondents' positions"; and, 3) they state his responses to questions 2, 8, and 10 were erroneous. Obj. to Mot. for Summ. J. at 27–28.

This Court agrees with the Plaintiffs that, particularly in the circumstances of this case, Mr. Fiacco should not have separately communicated with the Appeal Committee. It is true that, at the appeal stage, Mr. Fiacco was not technically a party; the Complainant and the Plaintiffs were separately represented by counsel; and, the decision before the Appeal Com-

mittee was not his, but the Hearing Committee's. There is also authority that in the course of an agency adjudication, a decisionmaker may consult behind the scenes with agency staff without running afoul of a party's right to due process. *See RSR Corp. v. FTC*, 656 F.2d 718, 724 (D.C.Cir.1981), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); *Maine Care Servs., Inc. v. USDA*, No. CIV. 00–358–P–H, 2001 WL 1399516, at *11 (D.Me. Nov.9, 2001); *New England Tel. & Tel. Co. v. Pub. Utils. Com'n*, 448 A.2d 272, 279 (Me.1982).

Nevertheless, the Plaintiffs had informed the Appeal Committee they were concerned about Mr. Fiacco's investigation and his role at the hearing and that Mr. Fiacco's actions were, from their perspective, a central issue on appeal. The Appeal Committee was charged with reviewing the case for procedural errors, and Mr. Costlow's October 8, 2002 letter made it clear the Plaintiffs were contending Mr. Fiacco had committed such errors and had acted unfairly toward them Further, from September 9, 2002, when he referred the case to the Hearing Committee, until September 17, 2002, when he was informed that the Complainant wished to present her own case, Mr. Fiacco, as the Officer under the Code, was the person charged with presenting the allegations against the Plaintiffs. SMF ¶ 178, Code § V.D.4.d. In these circumstances, Mr. Fiacco should not have been communicating *ex parte* with the Appeal Committee.

Whether Mr. Fiacco's *ex parte* contact with the Appeal Committee constituted a deprivation of due process, however, is more opaque.[49] *Ex parte* communications can "shadow the impartiality, or at least

the appearance of impartiality," of a proceeding and "may, in some circumstances, constitute a deprivation of due process of law." *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir.1976), *cert. denied*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976), *overruled on other grounds by Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Even though *ex parte* contacts are "improper and should be discouraged," a court will vacate a proceeding on due process grounds only where the "integrity of the process and the fairness of the result were irrevocably tainted by the communications." *Springfield Terminal Ry. Co. v. United Transp. Union*, 767 F.Supp. 333, 349 (D.Me.1991). There are a number of factors to consider: 1) the gravity of the contact; 2) whether the contact may have influenced the decision; 3) whether the party making the contact benefited from the decision; 4) whether the contents of the communications were unknown to the opposing parties, who had no opportunity to respond; and, 5) whether vacation of the decision and remand for further proceedings would serve a useful purpose. *Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth.*, 685 F.2d 547, 564–65 (D.C.Cir.1982)(*PATCO* ).

Here, the *ex parte* contact took place at the appeals stage. The Supreme Court of Texas and the Seventh Circuit have concluded that *ex parte* presentation of evidence at fact-finding hearings denies due process. *Swank v. Smart*, 898 F.2d 1247, 1253 (7th Cir.1990), *cert. denied*, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Univ. of Texas Med. Sch. v. Than*, 901 S.W.2d 926 (Tex.1995). As earlier noted, having received a full measure of due process at the hearing, the Plaintiffs are not

---

49. Much of the case law on *ex parte* contacts is derived from interpretations of the Administrative Procedures Act (APA), which contains an express statutory prohibition of such contacts. *See* 5 U.S.C. § 554(d). There is no allegation that the APA applies to the instant case.

entitled to any appeal under the due process clause. Nevertheless, because the University accorded the parties an appeal, it was required to carry out a fundamentally fair process.[50] *See Griffin*, 351 U.S. at 18, 76 S.Ct. 585.

The heart of the Plaintiffs' contention is that Mr. Fiacco supplied the Appeal Committee with erroneous information, and it is here—the gravity of the contact and its influence on the decision—that the Plaintiffs' due process claim founders.[51] The focus of the Plaintiffs' complaint[52] is that Mr. Fiacco misrepresented certain facts: 1) that the Plaintiffs had not submitted a witness list prior to the hearing; 2) that Mr. Costlow's silence after he had checked with his office about the receipt of police records allows an inference that his office

had received the records; and, 3) that the Plaintiffs "for unexplained reasons" failed to provide the Hearing Committee with an argument on sanctions. Obj. to Mot. for Summ. J. at 27.

Upon analysis, the Plaintiffs fall far short of demonstrating that Mr. Fiacco's statements rendered the appeal process irrevocably tainted with fundamental unfairness. Turning to the witness statement, the record reveals Mr. Fiacco's statement about the Plaintiffs' failure to submit a witness list was demonstrably incorrect, based on other documentation before the Appeal Committee. Mr. Costlow's September 13, 2002 letter to Mr. Fiacco in which he listed the Plaintiffs' potential witnesses was in the Hearing Committee's binder.[53] Moreover, the

**50.** The term "appeal" infuses judicial concepts into the more restricted review contemplated by the University's Code. The Code itself uses the term appeal and thereby clouds the issue. The Appeal Committee and President's designee revisit the hearing solely to assess procedural errors and the appropriateness of the sanction. This review process does not encompass the range of review attendant, for example, to judicial appellate review. As such, the due process standards, which are inherently flexible, may be less rigorous, because the rights are more circumscribed. Nevertheless, because under any standard the University's appeal process in this case survives challenge, this Court need not attempt to draw such distinctions.

**51.** This Court is unimpressed with the Plaintiffs' "adversary tone" argument. The Plaintiffs cite no case law, and this Court is aware of none that establishes a due process right to a neutral tone. A review of Mr. Fiacco's responses fails to substantiate the Plaintiffs' complaints. Moreover, if the Plaintiffs were correct, Mr. Fiacco's "advocacy" would have betrayed his bias. Had it been his intent to advocate, he would have been more effective adopting a tone of objectivity and neutrality.

**52.** It is unclear whether the Plaintiffs object to any separate communication between the Appeal Committee and Mr. Fiacco. The law

has long allowed administrative officers to rely on subordinates to sift and analyze the record and prepare summaries and confidential recommendations. *Morgan v. United States*, 298 U.S. 468, 481–82, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); *Normile v. McFague*, 685 F.2d 9, 12 (1st Cir.1982). The Appeal Committee questions were not directed to the case before them. They asked for background information about "standard practices" and "procedures in place" for handling disciplinary matters. Demonstrating the dangers inherent in this practice, Mr. Fiacco's responses strayed beyond the University's general procedures into their application to this case. The Appeal Committee should have informed the parties of all its contacts with Mr. Fiacco to give them an opportunity to understand and object, if necessary. The Plaintiffs have not, however, raised any specific objections to the accuracy of the background material Mr. Fiacco provided.

**53.** Perhaps through inadvertence, the parties failed to specify in their statements of material fact the information considered by the Appeal Committee. The Defendants listed the information Mr. Anderson reviewed at the next step in the appeal process, and this information included the material in the Hearing Committee binder. SMF ¶ 95. The parties submitted a copy of the material contained in the Hearing Committee binder, and Mr. Cost-

Plaintiffs' procedural argument concerned Dr. Allan's decision to allow testimony from the Complainant's unlisted witnesses. Whether the Plaintiffs filed their own list bears tangential, if any, relevance to this issue. Third, the Chair had the discretion in any event to allow the testimony of unlisted witnesses. *See supra* Part IV(C)(3)(a)(ii).

Mr. Fiacco's suggestion that negative inferences should be drawn from Mr. Costlow's silence regarding his office's receipt of the police records and his insertion of "unexplained" regarding the absence of an argument on sanctions are obviously Mr. Fiacco's personal opinion, not facts. The Appeal Committee was perfectly capable of drawing its own inferences from the record before it, and there is no evidence it was unduly influenced by Mr. Fiacco's unsolicited remarks. In short, the Plaintiffs' justifiable criticisms of Mr. Fiacco's *ex parte* contacts fail to rise to the level of a due process concern.[54]

#### (b) Mr. Cabelka's *Ex Parte* Contact

 The Plaintiffs argue the Appeal Committee's ongoing contacts with University Counsel Mr. Cabelka violated their due process rights. They claim Mr. Cabelka "severely restricted the Appeals Committee's perception of its role in the process." Obj. to Mot. for Summ. J. at 28. On October 10, 2002, Mr. Cabelka faxed a six-page legal memorandum to the Appeal Committee Chair, Mr. Whelan. SMF

¶ 251. Mr. Whelan distributed the Cabelka memorandum to the other members of the Appeal Committee, and during one of its meetings, the Appeal Committee discussed the memorandum with Mr. Cabelka. *Id.* The Plaintiffs argue this "memorandum selectively laid out cases and other legal authority in connection with some of the issues the Appeal Committee was considering, and painstakingly spelled out a one-sided view as to how limited the Respondents' rights were." Obj. to Mot. for Summ. J. at 28.

This argument is frivolous. Mr. Cabelka acted as counsel to the Appeal Committee. Unlike Mr. Fiacco, his earlier actions were not an issue on appeal nor had he been called a fact witness at the hearing. The Appeal Committee has a right to rely on staff support, including legal counsel. *See Morgan v. United States*, 298 U.S. 468, 481–82, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); *Normile v. McFague*, 685 F.2d 9, 12 (1st Cir.1982). Simply because Mr. Cabelka's legal advice did not coincide with the Plaintiffs' legal argument does not mean he was engaged in improper *ex parte* communications with the Appeal Committee.[55]

#### 4. Qualified Immunity

 Under well established law, individual defendants are entitled to qualified immunity for official action unless: (1) their conduct violated a constitutional right; and, (2) the law to this effect was

---

low's September 13, 2002 letter was included in the binder. Hearing Committee Binder at SCC 116–17.

**54.** To complete the *PATCO* analysis, Mr. Fiacco was not a direct beneficiary of the Appeal Committee decision, though as his handling of the disciplinary process as the Judicial Officer was an issue on appeal, he was an indirect beneficiary. There is no evidence that either party had any access to the information supplied by Mr. Fiacco until after the

Appeals Committee decision. Finally, this Court is convinced vacating the underlying decision and remanding to the Hearing Committee would serve no useful purpose. *PATCO*, 685 F.2d at 565.

**55.** In their objection, the Plaintiffs contend Mr. Cabelka's memorandum adopted a one-sided view of the legal issues before the Appeal Committee. This Court has reviewed the Cabelka memorandum and finds no such bias.

"clearly established" under then-existing law so that a reasonable official would have known that his behavior was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Dwan v. City of Boston*, 329 F.3d 275, 278 (1st Cir.2003) (citations omitted). Qualified immunity provides "an entitlement not to stand trial or face the other burdens of litigation." *Saucier*, 533 U.S. at 200, 121 S.Ct. 2151 (citation omitted); *Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 60 (1st Cir.2004). It is "designed to protect most public officials: '[I]t provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Riverdale Mills*, 392 F.3d at 60 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Taking the Plaintiffs' allegations in a light most favorable to them, this Court concludes the individual Defendants did not violate their due process rights; the individual Defendants are, therefore, entitled to qualified immunity.[56] Judgment will be entered in favor of the individual Defendants and against the Plaintiffs on Count II of the Plaintiffs' Amended Complaint.

### D. Count III: Breach of Contract [57]

█ In Count III, the Plaintiffs turn to the contract between themselves and the University and argue the contract imposed distinct and enhanced obligations, which provide alternative grounds for relief. The student-college relationship is essentially contractual in nature. *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998); *Goodman v. President & Trs. of Bowdoin Coll.*, 135 F.Supp.2d 40, 55 (D.Me.2001).

### 1. Contractual Obligation to Provide a Fundamentally Fair Hearing

The Plaintiffs contend the University violated its contractual obligation to provide a fundamentally fair hearing. The Code states: "THE UNIVERSITY'S ADMINISTRATIVE PROCESS AFFORDS FUNDAMENTAL FAIRNESS, BUT DOES NOT FOLLOW THE TRADITIONAL COMMON LAW ADVERSARIAL METHOD OF A COURT OF LAW." SMF ¶ 103; Code, Policy Statement. The concept of "fundamental fairness" is equivalent to due process. *See Newman v. Massachusetts*, 884 F.2d 19, 23 (1st Cir. 1989), *cert. denied*, 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990). The Plaintiffs concede the "facts and law supporting [their] due process claims against the individual defendants under Section 1983 ... also form bases for [their] contract claims against [the University]." Obj. to Mot. for Summ. J. at 30. Because the Plaintiffs failed to demonstrate a genuine issue of material fact regarding their due process claims, they cannot show they were contractually denied a fundamentally fair hearing.

### 2. Breach of Specific Contractual Provisions

█ The Plaintiffs' second contention is that various procedures employed by the University failed to comply with the Code. The terms of the student-college contract may include "statements provided in stu-

---

**56.** Having concluded the Plaintiffs' rights were not violated, this Court does not reach the questions of whether the individual Defendants' actions were "objectively reasonable" in light of "whether the [Plaintiffs'] rights were clearly established, and whether the contours of that right were sufficiently clear such that a reasonable official would have understood that the actions he took violated that right." *Cotnoir v. Univ. of Maine Sys.*, 35 F.3d 6, 10 (1st Cir.1994).

**57.** The Defendants do not dispute that a contract exists between the University and its students. *Gomes* 304 F.Supp.2d at 130.

dent manuals and registration materials." *Mangla*, 135 F.3d at 83. The proper standard for interpreting contractual terms is "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Id.* (citation and internal punctuation omitted). Therefore, this Court must apply a "reasonable expectation" test to the Plaintiffs' claims.[58]

### a. Old Town Police Department Documents

 The Student Code provides:

At the discretion of the Chair, the Respondent may submit written documents, oral testimony of witnesses, and all relevant documents, records, and exhibits at the time of the hearing.

. . . . .

During the hearing the Committee may consider any relevant information, shall not be bound by the strict rules of legal evidence, and may take into account any information which is of value in determining the issues involved. Efforts will be made to obtain the most reliable information available.

Code §§ V.D.4.e., i. The Plaintiffs claim that, by denying them the police records, the University failed to meet three contractual obligations: (1) to permit the Plaintiffs to submit all relevant documents; (2) to permit the Hearing Committee to consider any relevant information; and, (3) to make efforts to obtain the most reliable information available. Obj. to Mot. for Summ. J. at 31.

The Plaintiffs, in effect, would have these Code sections become contractual discovery provisions, mandating the University turn over any "relevant" or "reliable" information so the student may exercise his contractual rights. The Plaintiffs' argument strains construction.[59] Located under the heading "Hearing Procedures," the provisions give general guidance about the order and nature of the presentations at the hearing. The Code nowhere provides that a respondent has a right to access all material the Officer collects during the investigation, and this Court cannot conclude a student would have the "reasonable expectation" that this Code language granted such a contractual right.

### b. Impartial Tribunal

 The Plaintiffs argue Dr. Allan did not follow the provisions of § V.D.2.b. of the Code, which provides:

The Respondent charged with the violation, the Officer, and the Complainant shall have the right to challenge for cause any member of the Committee by submitting to a designated official a written memorandum stating the grounds for this challenge at least two days prior to the scheduled meeting. Removal of members for cause shall be within the authority and at the discretion of the Chair of the Committee or another member of the Committee if the Chair is unable to exercise that function or is challenged for cause.

Code § V.D.2.b. The Code permits a party to challenge for cause any committee

---

58. There is substantial overlap between the Plaintiffs' due process/fundamental fairness claims and their claims that the procedures provided in the Code were not followed. However, in their Objection to Motion for Summary Judgment, the Plaintiffs clarify which arguments support their claim that Code procedures were not followed.

59. This is akin to interpreting Rule 403 of the Federal Rules of Evidence as granting a discovery right to all "relevant evidence." If the University intended this provision to apply to discovery, it would have said so.

member he believes is biased. It also provides that if the Chair is challenged, she must refer the challenge to "another member of the Committee." *Id.*

Here, the Plaintiffs again seek to transform Code language into a discovery provision. The Code does not provide for voir dire, and this provision does not grant such a right. Moreover, the Plaintiffs failed to challenge the Chair, after being notified they could do so. Although the Code does not permit voir dire of the Hearing Committee members, the members were instructed to tell Dr. Allan if they were unable to judge the case fairly. SMF ¶ 84; Costlow Dep. Ex. 23. The University's procedures complied with the terms of this provision, and the Plaintiffs' claim of contractual breach fails.

### c. Witness List

■■ Code § V.D.1.b. states the Chair must "[l]ist in the notice to the Respondent the names of the Committee member(s) hearing the appeal and witnesses being invited by the Officer." Here, on September 17, 2002, the Complainant informed the University she was going to present her own case. SMF ¶ 178. The Code does not require the University to provide a list of witnesses a complainant intends to call; it only requires the notice include those witnesses "being invited by the officer." Code § V.D.1.b. The September 17th notice included the witnesses Mr. Fi-

acco invited. SMF ¶ 106. The University complied with the express language of the Code.

Nevertheless, the Plaintiffs argue that, when the Complainant undertook the presentation of evidence, her attorney, Mr. Hallett, became the "officer," defined in the Code as the "[p]erson(s) or designee responsible for adjudicating alleged violations of the Code," Code § II.G., and Mr. Fiacco "should have required Hallett to do what Fiacco would have had to do himself if he had presented the case, and that is provide a complete list of all witnesses." Obj. to Mot. for Summ. J. at 21. But, Mr. Hallett acted as the Complaint's advisor; he never assumed Mr. Fiacco's role as "officer." He never adjudicated the alleged violation.[60] Moreover, the Code does not require a complainant, as opposed to the Officer, to provide a list of witnesses. By its terms, this provision does not apply to the Complainant and was not breached by the University.

### d. Sanction Recommendation

Section V.D.4.h. provides that "the Officer or his/her advisor and the Respondent or his/her advisor may make recommendations to the Committee as to the appropriate sanctions should a violation(s) be found to have been committed." The Plaintiffs allege they were not given the opportunity to address sanctions during the hearing.[61] However, Mr. Costlow

**60.** As noted earlier, the role of counsel at the hearing is significantly limited, and, under the restrictions in the Code, Mr. Hallett did not assume the role of the "Officer" when the Complainant decided to present the case herself.

**61.** At oral argument, Attorney Richardson argued the Code contemplated separate processes: determination of responsibility and, then, determination of sanction. In other words, the Hearing Committee had to make a finding of whether a violation occurred, an-

nounce the finding, and then allow the parties to argue sanctions. This view of a bifurcated hearing draws no support from the Code. The Code provides under § V.D.4.g. that "[a]fter the presentation of all the evidence to the Committee, each party ... may present arguments to the Committee on the applicability of this Code or the interpretation of any sections herein." Under § V.D.4.h., the Code provides: "*At this time*, the Officer ... and the Respondent ... may make recommendations to the Committee as to the appropriate sanctions should a violation(s) be found to

made closing remarks on behalf of the Plaintiffs during which he alluded to the impact of the decision and proper punishment. SMF ¶¶ 99, 277. There is no evidence the University denied the Plaintiffs an opportunity to comment on or recommend sanctions. The Plaintiffs' failure to do so more explicitly does not state a contractual breach by the University.

### e. Procedural Errors

Section V.E.1. of the Code states, "In the event the Committee approves a sanction of Suspension or Dismissal ... the Respondent may request review by the President or his/her designee." Section V.E.1.a. provides that review of the appeal shall be limited to "[r]eview of the procedures followed. *In the event of a procedural error, the President or his/her designee shall reverse and remand the case to the Committee for a new hearing.*" (Emphasis added). The Plaintiffs allege the Defendants had an obligation to reverse the Hearing Committee decision and remand for a new hearing because of alleged procedural errors. This Court has concluded there were no procedural errors to justify reversal. This contractual provision was therefore not violated.

### f. Appeal

The Code states that review of the appeal "shall be ... limited" to "[r]eview of the procedures followed" and the "[a]ppropriateness of the sanction." Code § V.E.1.a., b. It is reasonable for the University to expect a student reading these provisions would not believe the University was required to review the merits of the case. The Appeal Committee followed the strictures of the Code and evaluated the Hearing Committee decision for procedur-

al errors and the appropriateness of the sanctions. The Defendants did not breach the contract provisions relating to appeals.

### E. Counts VI, VII, VIII, and IX: Tort Claims

Count VI, VII, and VIII allege negligence, defamation, and negligent and/or intentional infliction of emotional distress against all the Defendants; Count IX alleges negligent misrepresentation against the University, its Trustees, and individual Defendants Fiacco and Dana. The Defendants contend they are immune from these tort claims under the Maine Tort Claims Act (the Act).

### 1. Individual Defendants

Under the Act, employees of governmental entities are absolutely immune from personal civil liability for: (1) discretionary acts performed within the scope of their employment; and, (2) intentional acts or omissions occurring in the scope of their employment, provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith. 14 M.R.S.A. §§ 8111(1)(C) & (E). This immunity "insulates from personal liability a government employee who has been legislatively authorized to perform some discretionary function and 'has acted, or has failed to act, pursuant to that authorization.'" *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 425 (Me.1987)(quoting *True v. Ladner*, 513 A.2d 257, 260 (Me.1986)). In response to *True*, the Maine Legislature amended § 8111(1), expanding the scope of discretionary acts beyond those expressly authorized by "statute, charter, ordinance, order, resolution, rule or resolve" to include those "reasonably encompassed by

have been committed." (Emphasis added). The reference to "[a]t this time" must be to § V.D.4.g.'s presentation of argument. There

is no provision in the Code that requires the Hearing Committee to engage in a bifurcated hearing.

the duties of the governmental employee." *See* L.D. 2443, 2d Sess. 16 (113th Leg. 1988); *Grossman v. Richards*, 1999 ME 9, ¶¶ 5–12, 722 A.2d 371, 373–75.

■■■ In *Darling*, the Law Court established a four-prong test to determine governmental immunity: (1) whether the act necessarily involves a basic governmental policy, program or objective; (2) whether the act is essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective; (3) whether the act requires the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental entity involved; and, (4) whether the government possesses the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act. *Darling*, 535 A.2d at 426.

In their Objection to Motion for Summary Judgment, the Plaintiffs argue that summary judgment should not be granted on the question of individual immunity because the University employees acted intentionally and in bad faith. Obj. to Mot. for Summ. J. at 33–34 (citing § 8111(1)(E)). In support, they cite *Trafton v. Devlin*, 43 F.Supp.2d 56 (D.Me. 1999). In *Trafton*, however, Judge Brody made a preliminary determination that the failure of the warden service to turn over exculpatory evidence to the defense was not a discretionary act under § 8111(1)(C). *Trafton*, 43 F.Supp.2d at 61. He then reached the question of whether the wardens were immune under § 8111(1)(E). *Id.* at 61–62.

■■■ Here, by contrast, this Court concluded the acts of the individual Defendants were discretionary acts within the meaning of § 8111(1)(C): "[I]nvestigating a student disciplinary complaint, conducting a disciplinary hearing, and issuing a

decision would seem by the nature of the activity not to be ministerial duties, to require the exercise of discretion, and to be within the scope of the official's legal authorization." *Gomes*, 304 F.Supp.2d at 135. A defendant needs to be immune under only one provision. The Maine Supreme Judicial Court has held that if an employee is immune under § 8111(1)(C), the Court does not reach the issue of bad faith under § 8111(1)(E). *Grossman*, 1999 ME 9, ¶ 10, 722 A.2d at 374–75 (the " 'bad faith proviso' in subparagraph E does not apply to the absolute immunity that subparagraphs A through D provide."); *Berard v. McKinnis*, 1997 ME 186, ¶ 11 n. 7, 699 A.2d 1148, 1152 n. 7; *Dall v. Caron*, 628 A.2d 117, 119 (Me.1993). Because the individual Defendants performed a discretionary function or duty under § 8111(1)(C), they are "absolutely immune" from personal civil liability. *See* § 8111(1).

### 2. University Defendants

#### a. The University's Failure to Demonstrate an Absence of Insurance Coverage

The Act provides that governmental entities are immune from suit on tort claims unless immunity is removed by statute. 14 M.R.S.A. § 8103(1); *see also id.* § 8104–B(3)(the Act provides a discretionary function immunity to a governmental entity for any claim which results from "[p]erforming or failing to perform a discretionary function or duty, whether or not the discretion is abused and whether or not any statute, charter, ordinance, order, resolution or policy under which the discretionary function or duty is performed is valid or invalid."). However, if a governmental entity procures insurance that provides coverage in areas where the governmental entity is immune under the Act, the entity waives its immunity to the limits of

the insurance coverage. *Id.* § 8116; *Napier v. Town of Windham*, 187 F.3d 177, 190 (1st Cir.1999). As governmental immunity is an affirmative defense, the University bears the burden to establish it had no insurance coverage for the Plaintiffs' claims. *See Napier*, 187 F.3d at 190.

The Plaintiffs argue this Court should not grant summary judgment on their tort claims against the University Defendants because the University has failed to show that it has not waived its statutory immunities by procuring liability insurance. This Court addressed this waiver issue in its previous order: "As qualified immunity is an affirmative defense and as there is no evidence of an absence of coverage, the Plaintiffs properly argue that the Complaint as against the University is not subject to a Rule 12(b)(6) dismissal." *Gomes,* 304 F.Supp.2d at 131. Nothing has changed since then; the University has not produced evidence it does not possess insurance coverage for the tort claims.[62] Under § 8116, the University may have waived its statutory immunities by procuring liability insurance coverage, so summary judgment on the basis of those immunities, without proof of no insurance, is premature.[63]

**b. The Merits of the Tort Claims**

Even if the University has insurance coverage for the tort claims, the Defendants are entitled to summary judgment on those claims.

**i. Negligence**

In their negligence claim, the Plaintiffs allege the "Defendants had a duty to act with reasonable care in conducting disciplinary proceedings against the Plaintiffs under the Student Conduct Code" and that the Defendants' failure to do so caused them harm. Am. Compl. ¶ 41. In their Objection to Motion for Summary Judgment, they assert that the Defendants "breached that duty by failing to take reasonable steps to ensure a fair hearing, as described above with respect to Plaintiffs' due process claims." Obj. to Mot. for Summ. J. at 34–35.

■ In Maine, as elsewhere, a prima facie case of negligence requires a plaintiff to establish four elements: duty, breach, causation, and damages. *Mastriano v. Blyer,* 2001 ME 134, ¶ 11, 779 A.2d 951, 954. A duty is "an obligation, to which the law will give recognition and effect, to conform to a particular manner of conduct toward another." *Budzko v. One City Ctr. Assocs. Ltd. P'ship,* 2001 ME 37, ¶ 10, 767 A.2d 310, 313 (citation and internal punctuation omitted). A college has a legal duty to exercise reasonable care towards its students. *Searles v. Trs. of St. Joseph's Coll.,* 1997 ME 128, ¶ 5, 695 A.2d 1206, 1209. "Duty involves the question of whether the defendant is under any obligation for the benefit of the particular plaintiff. When a court imposes a duty in a negligence case, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Id.* (citation and internal punctuation omitted).

The Plaintiffs' allegations of negligence track their allegations of due process violations, and this Court has determined no constitutional violations took place. Applying a "reasonable care" analysis to the University's conduct of the disciplinary

---

62. The University conceded as much at oral argument.

63. Section 8116 "does not waive immunity for otherwise immune municipal employees who have insurance; it does that only as to a government entity." *Napier,* 187 F.3d at 190 (citation and internal punctuation omitted). Therefore, there is no genuine issue as to whether the individual Defendants waived their statutory immunity.

proceedings results in the same conclusion this Court reached in its due process analysis. Even when viewed in a light most favorable to the Plaintiffs, this Court cannot conclude the University Defendants breached their duty of reasonable care.

### ii. Defamation

The Plaintiffs allege the "Defendants, through their statements and actions, have falsely stated that Plaintiffs committed a sexual offense" and that the "Defendants' actions in conducting the hearing and suspending the Plaintiffs, and any other public statements made by the Defendants regarding the suspension, constitute an unprivileged publication of false and defamatory information." Am. Compl. ¶ 43. The Plaintiffs point to four allegedly defamatory statements: 1) the University's disciplinary decision; 2) statements by Mr. Dana, Dean of Student Affairs, to the Blethan Maine Newspapers, Inc.;[64] 3) a letter to the National Collegiate Athletic Association (NCAA) by Attorney Paul Chaiken;[65] and, 4) compelled self-publication.[66] Obj. to Mot. for Summ. J. at 36–37.

The defamation claim assumes a counterintuitive posture in the context of the Defendants' Motion for Summary Judgment. This Court is required to view the facts in a light most favorable to the Plaintiffs, and in their Amended Complaint and statement of material facts, they state the Complainant's allegation of a sexual assault was false and the sexual activity was consensual. Am. Comp. ¶ 15; SMF ¶ 274.

Once this Court assumes the sexual activity was consensual and the conclusions of the Hearing Committee were wrong, the Plaintiffs argue publication of these false conclusions constitutes defamation, or, at least in the context of this motion, raises a factual question as to whether the University Defendants defamed the Plaintiffs. *See Donatelli v. UnumProvident Corp.*, No. 04-1-P-S, 2004 U.S. LEXIS 25866, at *41 (D.Me. Dec. 22, 2004)("Whether a conditional privilege has been abused is a question of fact."); *Rippett v. Bemis*, 672 A.2d 82, 87 (Me.1996)(whether a conditional privilege arises is a question of law; whether the statement was required or permitted is a question of fact).

Under Maine law, defamation requires: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and, (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Rippett*, 672 A.2d at 86 (citing *Lester v. Powers*, 596 A.2d 65, 69 (Me.1991)).

Even if the Plaintiffs were to establish a prima facie defamation case, a statement from a University official that the Plaintiffs were found to have violated the Code is conditionally privileged. "A conditional privilege against liability for

---

**64.** Mr. Dana spoke with a reporter from Blethen Maine Newspapers about the Hearing Committee findings and sanctions. SMF ¶ 284. Blethen reported the Hearing Committee had found an "off-campus rape" had occurred and the Plaintiffs had been suspended. *Id.*

**65.** Attorney Paul Chaiken, acting for the University, wrote to the NCAA in September 2003, informing it the University had concluded Mr. Minor committed a sexual assault

and he had been suspended. SMF ¶ 281. He enclosed a copy of the Maine District Court transcript on the temporary protection order. *Id.* ¶ 282.

**66.** When Mr. Minor assisted the University of Tennessee Martin with its application to the NCAA for permission for him to play college football, Mr. Minor was required to publish what he contends were the University's false statements. SMF ¶¶ 279, 280.

defamation arises in settings where society has an interest in promoting free, but not absolutely unfettered, speech." *Lester*, 596 A.2d at 69 (tenure review); *see also Rice v. Alley*, 2002 ME 43, ¶¶ 24–26, 791 A.2d 932, 937–38 (statements about member and officer of Elks Lodge Auxiliary conditionally privileged); *Cole v. Chandler*, 2000 ME 104, ¶ 6, 752 A.2d 1189, 1193 (employer entitled to conditional privilege in slander case arising out of termination of employment relationship); *McCullough v. Visiting Nurse Serv. of S. Maine, Inc.*, 1997 ME 55, ¶ 11, 691 A.2d 1201, 1204 (statements among members of employer's management concerning disciplinary action against terminated employee were conditionally privileged); *Onat v. Penobscot Bay Med. Ctr.*, 574 A.2d 872, 874 (Me.1990)(anesthesiologist failed to show that members of peer review board acted with malice when they suspended his staff privileges, as was necessary to his claim of defamation); *Gautschi v. Maisel*, 565 A.2d 1009, 1011 (Me.1989)(professor had conditional privilege to communicate to tenure committee the contents of a telephone conversation with professor at another college where candidate had previously been employed, during which that professor made negative comments regarding candidate's scholastic qualifications, and candidate was not able to establish falsity of statements attributable to professor at his former college, or malice on the part of tenure committee member in communicating statements). "Conditional privilege is based upon the circumstances of 'the occasion upon which the defendant published defamatory matter.'" *Lester*, 596 A.2d at 70 (citation omitted). There is no list of particular settings to which conditional privileges are restricted; instead, a weighing approach based on the totality of the circumstances, in view of the interests of the publisher and the recipient, is used. *Id.* "If a conditional privilege exists, liability

for defamation attaches only if the person who made the defamatory statements loses the privilege through abusing it. . . . Such an abuse occurs when the person either knows the statement to be false or recklessly disregards its truth or falsity." *Id.* at 69.

Maine has not directly addressed whether a conditional privilege attaches to a student disciplinary procedure; however, it has extended a conditional privilege to college tenure reviews, medical staff peer reviews, employment terminations, and even to statements about a member and officer of the Elks Lodge Auxiliary. The Plaintiffs concede, and this Court agrees, that a university disciplinary proceeding for a student is a setting "where society has an interest in promoting free, but not absolutely unfettered speech," *id.*, and the conditional privilege attaches to university statements concerning the proceeding. *See Tynecki v. Tufts Univ. Sch. of Dental Med.*, 875 F.Supp. 26, 35 (D.Mass.1994); *Vargo v. Hunt*, 398 Pa.Super. 600, 581 A.2d 625, 627 (1990).

If the defendant is entitled to a conditional privilege, the burden shifts to the plaintiff to " 'come forward with evidence that could go to a jury that [the defendant] abused the privilege.'" *Cole*, 2000 ME 104, ¶ 7, 752 A.2d at 1194 (quoting *Gautschi*, 565 A.2d at 1011). Abuse includes "making the statement outside normal channels or with malicious intent." *Id.* For purposes of defamation claims, malice means when the originator of the statement "knows his statement to be false, recklessly disregards its truth or falsity, or acts with spite or ill will." *Id.* (citations and internal punctuation omitted). Reckless disregard for the truth can be proved by evidence that "establishes that the maker of a statement had a high degree of awareness of probable falsity or serious doubt as to the truth of the statement."

*Rippett,* 672 A.2d at 87 (citation and internal punctuation omitted). In *Lester,* the Maine Supreme Judicial Court explained that a loss of a conditional privilege may occur when the statement is made "not for the purpose of protecting the interest giving rise to the privilege, but out of other motives entirely, such as spite or ill-will." *Lester,* 596 A.2d at 69 n. 7.

Even when viewed in a light most favorable to the Plaintiffs, none of the four allegedly defamatory statements comes close to meeting the high definitional standards for abuse of the conditional privilege. The first and last of the allegedly defamatory statements were grounded on the decision of the Hearing Committee itself, and there is no evidence the Hearing Committee issued its decision knowing it was false, in reckless disregard of its truth or falsity, or acted with ill will or spite. The three remaining statements were made after the Hearing Committee had determined the Plaintiffs had committed a sexual assault in violation of the Code and were subject to sanctions. There is simply no evidence Mr. Dana and Mr. Chaiken published statements about the Plaintiffs that amounted to an abuse of the conditional privilege within the *Cole* definition.

 Compelled self-publication provokes an episode of legal tail chasing. Assuming the Hearing Committee's decision was false, Mr. Minor certainly knew it to be false, and his compelled publication of the University's false decision constituted defamation by his own hand. The Maine Supreme Judicial Court has reserved judgment on whether Maine law permits a defamation claim based upon compelled self-publication; however, this Court has concluded Maine would recognize this legal theory. *Compare Cole,* 2000 ME 104, ¶ 5, 752 A.2d at 1193 ("We need not reach the issue of compelled self-publication . . . ."), *with Smith v. Heritage Salmon, Inc.,* 180

F.Supp.2d 208, 222 (D.Me.2002), *and Carey v. Mt. Desert Island Hosp.,* 910 F.Supp. 7, 11–13 (D.Me.1995).

Assuming compelled self-publication applies, the next step is to determine how the conditional privilege applies. The analysis cannot focus on Mr. Minor's state of knowledge when he made a compelled republication of what he knew to be false. If it did, the result would be a legal syllogism: because he was the alleged perpetrator and knew the decision was false, his republication would obviate the conditional privilege defense. Instead, the focus must be on the University, since it is the entity with the conditional privilege. Thus focused, the conclusion remains the same: there is no evidence the Hearing Committee violated the *Cole* standards and, therefore, this Court concludes that the University "enjoyed a conditional privilege and did not abuse that privilege." *Cole,* 2000 ME 104, ¶ 8, 752 A.2d at 1194.

This Court concludes, absent evidence of abuse of the conditional privilege by an official, employee, or attorney of the University, the University Defendants are entitled to summary judgment on the defamation count.

### iii. Intentional Infliction of Emotional Distress

 To withstand a motion for summary judgment on a claim of intentional infliction of emotional distress, a plaintiff must present facts in support of each of the following elements:

(1) [T]he defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the

actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it." *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22–23 (citations omitted). "In the context of a civil claim for damages, a person may be said to act recklessly if he knows or has reason to know of facts giving rise to a high degree of risk of harm to another and yet deliberately acts, or fails to act, in conscious disregard of that risk." *Maine Mut. Fire Ins. Co. v. Gervais*, 1998 ME 197, ¶ 12, 715 A.2d 938, 941. The Plaintiffs cannot establish a prima facie case. The Plaintiffs admit the Hearing Committee found that they sexually assaulted the Complainant; the Plaintiffs' disagreement does not transform this finding into an intentionally false statement.

#### iv. Negligent Misrepresentation

█ The Plaintiffs' negligent misrepresentation claim is based on Mr. Fiacco's alleged statement that "he would gather all of the necessary information from his investigation and forward it to the SCCC." SMF ¶ 258; Obj. to Mot. for Summ. J. at 38. The Plaintiffs argue the Defendants are not entitled to summary judgment because they "have offered evidence that Fiacco did not forward all of the necessary information from his investigation" to the Hearing Committee. Obj. to Mot. for Summ. J. at 39. The Plaintiffs cite statements of material fact 33 through 40, statements that concern only the Old Town Police Department reports. *See.* SMF ¶¶ 33–40.

In *Chapman v. Rideout*, 568 A.2d 829, 830 (Me.1990), the Law Court adopted § 552(1) of the Restatement (Second) Of Torts (1977) as the standard for claims of negligent misrepresentation. Section 552(1) defines negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1). Liability attaches only if, when communicating the information, the defendant "fails to exercise the care or competence of a reasonable person under like circumstances." *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771, 774–75; *see also Perry v. H.O. Perry & Son Co.*, 1998 ME 131, ¶ 5, 711 A.2d 1303, 1305; *Chapman*, 568 A.2d at 830.

This tort fits awkwardly, if at all, to this case. Negligent misrepresentation is commonly applied to commercial transactions.[67] Unlike most torts, the damages are limited to pecuniary loss. Restatement (Second) of Torts § 552(1)(subject to "pecuniary loss caused to them by their justifiable reliance upon the information"); *id* § 552B ("The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for

---

67. "The reason a narrower scope of liability is fixed for negligent misrepresentation than for deceit is to be found in the difference between the obligations of honesty and of care, and in the significance of this difference to *the reasonable expectations of the users of information that is supplied in connection* *with commercial transactions....* Any user of *commercial information* may reasonably expect the observance of this standard by a supplier of information to whom his use is reasonably foreseeable." Restatement (Second) of Torts § 552, Comment a (emphasis added).

the pecuniary loss to him of which the misrepresentation is a legal cause ....”). This Court is not convinced the facts in this case generate the necessary predicate for the tort of negligent misrepresentation in this disciplinary proceeding.[68]

If it does apply, the Plaintiffs' contention does not withstand analysis. Statement of material fact ¶ 258, in which they claim that Mr. Fiacco stated he would “gather all of the necessary information from his investigation and forward it to the [Hearing Committee],” refers to a portion of Mr. Minor's deposition transcript.[69] Mr. Minor was testifying to his first meeting with Mr. Fiacco on August 5, 2002, and he does not assert Mr. Fiacco made any mention at that time of Old Town Police Department reports. Minor Dep. at 26. This meeting took place before the Complainant signed an Incident Report, before the issue of police record confidentiality had been raised by the parties, and before Mr. Fiacco turned a statement in the police report over to the Complainant, but not to the Plaintiffs. Mr. Fiacco's statement to the Plaintiffs was in the context of a general explanation of the disciplinary process and his role in it. Even viewing the evidence in a light most favorable to the Plaintiffs, this Court cannot construe Mr. Fiacco's August 5, 2002 overview of the process as a promise upon which the Plaintiffs had a right to rely to place the Old Town Police

Department records before the Hearing Committee. At most, it was a general description of his duties, not a guarantee to provide specific information to the Hearing Committee.

Further, to recover, the Plaintiffs would have to establish they had justifiably relied on this representation. By early September 2002, the basis for any such reliance had dissipated. The Plaintiffs knew Mr. Fiacco was not going to present the police reports to the Hearing Committee. Any justifiable reliance in early August 2002 was eclipsed by subsequent events, including the involvement of University counsel, questions about the applicability of 16 M.R.S.A. § 617, and the interposition of the District Attorney's office. The Restatement imposes a strict contributory negligence standard to the recipient of the fraudulent misrepresentation. Restatement (Second) of Torts § 552A; Simmons, Zillman & Gregory, *Maine Tort Law* § 11.08 at 11–15 (2004 ed.)(“[C]ontributory negligence of the recipient bars her recovery.”).[70] In addition, the action is limited to matters in which the supplier of the information has “a pecuniary interest.” Restatement (Second) of Torts § 552(1). There has been no evidence Mr. Fiacco or the University had a “pecuniary interest” in the outcome of the disciplinary hearing. *See id.*

---

**68.** In their Amended Complaint, the Plaintiffs allege the University Defendants “supplied false information for the guidance of the Plaintiffs in their transactions as students and student athletes.” Am. Comp. ¶ 47. The bare allegation survived a motion to dismiss. However, as it is now clear the Plaintiffs were referring to Mr. Fiacco's statement, the theory does not fit the facts.

**69.** The cited portion of the transcript reads: “He told us that his job as the judicial officer was to gather all relevant information, put it together. At that time he could either make a decision, or he could recommend it to a com-

mittee and give the committee all the relevant information on the case.” Minor Dep. at 26, lines 18–22.

**70.** The Restatement acknowledges that, with respect to physical harms caused by negligence, the old rule that contributory negligence is a complete bar is yielding to a trend toward comparative negligence. However, it states that it is “debatable whether this development should affect liability for pecuniary harm as well.” Restatement (Second) of Torts § 552A, Comment b.

Finally, the Plaintiffs' damages are limited to out-of-pocket losses. *See id.* § 552B, Comment a; *Maine Tort Law* § 11.08 at 11–15. The Plaintiffs may not recover for the benefit promised by the representation. *Id.* The Plaintiffs have not produced any evidence from which this Court can conclude they suffered out-of-pocket losses directly from Mr. Fiacco's failure to supply the police reports to the Hearing Committee.

### F. Count X: Punitive Damages

In light of the disposition of this case, the claim for punitive damages is dismissed.

### V. CONCLUSION

This Court GRANTS the Defendants' Motion for Summary Judgment; judgment is to be entered in favor of the Defendants and against the Plaintiffs on all remaining counts.